No. 25-7341

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

BERKELEY HOMELESS UNION, ET AL.

*Plaintiffs-Appellees.*

v.

CITY OF BERKELEY, ET AL.,

*Defendants-Appellants*,

On Appeal from the United States District Court
for the Northern District of California
No. 3:25-CV-01414-EMC
Hon. Edward M. Chen

---

**APPELLANTS' EXCERPTS OF
RECORDS VOLUME 1 of 6**

---

Farimah Faiz Brown, City Attorney, No. 201227
Laura Iris Mattes, Deputy City Attorney, No. 310594
Stephen A. Hylas, Deputy City Attorney, No. 319833

Berkeley City Attorney's Office
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
(510) 981-6998
lmattes@berkeleyca.gov

*Attorneys for Appellants*
*City of Berkeley, Thomas Gregory, Paul Buddenhagen,*
*Peter Radu, Okeya Vance-Dozier, Rashi Kesarwani*

ER-1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BERKELEY HOMELESS UNION, et al.,

            Plaintiffs,

      v.

CITY OF BERKELEY, et al.,

           Defendants.

Case No.  25-cv-01414-EMC   (EMC)

**ORDER GRANTING IN PART
REQUEST FOR EXTENSION OF TIME**

Docket No. 159, 160, 161

      The Court has reviewed Mr. Prince's request for an extension of time to file a status report on the ADA interactive process, and the City's opposition.  Good cause appearing, the request is **GRANTED IN PART**.

      The deadline to file a joint status report on the interactive process is **extended to January 6, 2026**.  A status conference regarding the completion of the interactive process is hereby set for **January 13, 2026**.

      **IT IS SO ORDERED**.

Dated: October 22, 2025

_____
EDWARD M. CHEN
United States District Judge

                                        **Pages 1 - 22**

                        UNITED STATES DISTRICT COURT

                      NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

BERKELEY HOMELESS UNION, et      )
al.,                             )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )      **NO. 3:25-CV-01414-EMC**
                                 )
CITY OF BERKELEY, et al.,        )
                                 )
          Defendants.            )
_____  )


                              San Francisco, California
                              Friday, September 12, 2025

              **TRANSCRIPT OF REMOTE ZOOM PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:
                    LAW OFFICES OF ANTHONY D. PRINCE
                    2425 Prince Street, #100
                    Berkeley, CA 94705
              **BY: ANTHONY D. PRINCE**
                  **ATTORNEY AT LAW**


For Defendants:
                    CITY OF BERKELEY
                    2180 Milvia Street
                    Berkeley, CA 94704
              **BY: MARC A. SHAPP**
                  **ATTORNEY AT LAW**


REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                       Official United States Reporter

```
 1    Friday - September 12, 2025                    9:57 a.m.

 2                    P R O C E E D I N G S

 3                        ---o0o---

 4        THE COURTROOM DEPUTY:  We are here in Case

 5    Number 25-1414, Berkeley Homeless Union versus City of

 6    Berkeley.  Counsel, if you would please state your appearance

 7    beginning with Mr. Prince.

 8        MR. PRINCE:  Thank you, Madam Deputy.

 9        Good morning, Judge.  This is Anthony Prince for

10    plaintiffs.

11        THE COURT:  All right.  Good morning, Mr. Prince.

12        MR. SHAPP:  Good morning, Your Honor.  Mark Shapp for

13    the City of Berkeley and the defendants.

14        THE COURT:  All right.  Good morning, Mr. Shapp.

15        All right.  We are here on the, I don't know if we call

16    this TRO or request to enforce injunction.  It kind of doesn't

17    matter.  I think the standards apply, same standards apply as

18    if this were a TRO.

19        So the first question is:  What is the scope of the action

20    that's about to be taken that's sought to be enjoined, and the

21    public notice which was posted on September 8th is specifically

22    addressed to, quote, persons encamped on the east side of 8th

23    Street between Harrison and Codornices Creek.

24        Now, I know that it goes on in the text to say, by the

25    way, lodging and prohibited all along the corridor on Harris
```

```
 1   between 6th and 10th, as well as 8th Street from Gilman to the

 2   creek, but the action that is proposed, I want you to confirm

 3   this, Mr. Shapp, is only with regard to that one block between

 4   Harrison and the creek on the east side of 8th Street, correct?

 5        MR. SHAPP:  Yes, that's correct, Your Honor.

 6        THE COURT:  And as you last counted or your staff

 7   determined, there was five, now six people residing in that

 8   camp?

 9        MR. SHAPP:  That's correct, Your Honor.

10        THE COURT:  And none of those on that side of the

11   street are any of the eight who have been, I know it's been

12   ill-fated so far, but engaged in the interactive process, nor

13   did they include the 19 that was originally identified as those

14   seeking accommodations; is that correct?

15        MR. SHAPP:  That's correct.  And also none of them

16   have been identified as members of the Berkeley Homeless Union.

17        THE COURT:  All right.  Well, so Mr. Prince, I know

18   that -- I've read the papers, but if this is the narrow scope

19   of what is being planned, I have a hard -- and one-week notice

20   appears to be given -- that was the one restriction I had

21   placed, whether you're a person engaged in the interactive

22   process or not, I'm sort of hard-pressed to see what there is

23   for me to enjoin.

24        MR. PRINCE:  Well, Judge, actually if you look at the

25   notice, page -- it's page 8 of Document 139-1, it's -- the
```

 1   description of this much broader area is not merely a notice

 2   about lodging and whatnot.  It says:  You have until

 3   September 15th to find another location for yourself and your

 4   belongings.  It says that one, two, three, four times.  The

 5   specific date, September 15th, is in that notice.  And that's

 6   why we indicated at the outset in the motion that there is

 7   ambiguity, but our concern is that this notice is more than

 8   just identifying that broader geographical area.  They have

 9   that date on there.

10       And so that is -- it's not true that it's there for just

11   some information purposes only.  That's part of the directive

12   of this notice.

13          THE COURT:  All right.  But this -- that -- you're

14   looking at a fact sheet that's Attachment 1 to the public

15   notice, and the public notice at the outset says:  To persons

16   encamping on the east side of 8th Street between Harrison and

17   Codornices Creek.

18       And I assume, Mr. Shapp, that's -- those are the folks who

19   received this notice?

20          MR. SHAPP:  That's correct, Your Honor.  The notice

21   was specifically posted on that one short stretch of 8th

22   Street.

23          THE COURT:  Okay.  So even though there's an

24   attachment and if one read that I guess they could conclude

25   this includes a broader area, but the notice is directed only

1    to those folks.  And the City could not proceed, because I said

2    you have to give at least a week's notice to other folks.  They

3    haven't been given that notice because this notice was posted

4    in one block.

5           **MR. SHAPP:**  We agree 100 percent, Your Honor.

6        We don't agree that the fact sheet is ambiguous at all.

7    Codornices Creek area, as the Court acknowledged, yes, that is

8    a no-lodging area, but the way the fact sheet is written, that

9    fact is true writ large, but you have until September 15th.

10   That's attached to a notice that was only provided to the folks

11   who are currently on 8th Street between Harrison and Codornices

12   Creek.

13          **THE COURT:**  All right.  So Mr. Prince, if I, in

14   issuing this order, which would be essentially denying the

15   relief on the understanding that the planned action is limited

16   to that side of one side of 8th Street -- I mean, one side of,

17   yeah, 8th Street, and that notice has been duly given to those

18   residents and not others, then I don't see the harm.  I mean, I

19   know you're fearful that the other shoe's gonna drop, but

20   that's not before me at this point.

21          **MR. PRINCE:**  Well, I would say, Your Honor, again,

22   first of all, this notice is making the rounds all throughout

23   the encampment.  Its people are panicked, people are concerned,

24   and in large part --

25          **THE COURT:**  All right.  So if I issue an order that

 1  clarifies and adopts what the City just told me, then you can

 2  circulate that and people will know what's going to happen on

 3  Monday concerns half -- east side of one block.

 4          MR. PRINCE:  Okay.  Well, all right.  Let me, if I

 5  could, the other two issues that are -- that stand out is it is

 6  not true that there are no people at that narrow area that's

 7  specific with the first page that notice is addressed to.  It

 8  is not true that it is without persons there who are protected

 9  under the order, and one of them is Rufus White.  His name is

10  on the list of the original 19 that had applications on file

11  and as of the June 10th order, and he is in that encampment.  I

12  have received details this morning from Yesica Prado.  He's in

13  a wheelchair.  He had an application on file, and he was served

14  with this notice, and simply because --

15          THE COURT:  So he resides on the east side of 8th

16  Street between --

17          MR. PRINCE:  Yes.

18          MR. SHAPP:  He does not, Your Honor.  Mr. White has

19  signed a lease for permanent supported housing.  He is not

20  unhoused, and he was not part of the census that was taken

21  either before or after.

22          THE COURT:  All right.  I understand that that --

23  there is a dispute whether he's entitled to it, but if the

24  injunction, if my order says if Mr. Rufus White is on that east

25  side of the street, he would be exempt.  And there's no harm to

1   the City because he's not there, right?  And then that would

2   satisfy the plaintiffs because you're concerned him, so that we

3   can easily solve that.

4          MR. PRINCE:  Judge, he is there.  He is in a

5   wheelchair.  He is not in that housing, and very oftentimes the

6   City will represent that someone's been housed because the

7   process is underway.  He is not in that housing.  He is at that

8   site.  He is in the area that is noticed to be swept on Monday.

9          THE COURT:  On the east side of 8th Street?

10          MR. PRINCE:  That's correct, Your Honor.

11      And moreover, moreover, the concern we have is that there

12   are others.

13      First of all, Mr. Galloway's declaration indicates that

14   he -- it would -- you would think that he was able to identify

15   and in his survey account for everyone there, but he didn't.

16   There are others.

17          THE COURT:  Well, you tell me who else from that

18   list.  And I know that list is in dispute, because the City

19   says there's only eight people that have a legitimate claim for

20   the interactive process, but of the eight or the 19 besides

21   Mr. White, who else are you telling me is in there?

22          MR. PRINCE:  We're trying to determine that now, Your

23   Honor, because people move.  People are not necessarily in one

24   place and they might shift to another place.  We simply don't

25   know.  Mr. Galloway himself said he went there on August 29th

1    and conducted a survey, and he went back on September 9th, and

2    Mr. Brian, I can't remember the last name, Mr. Brian, a person

3    named Brian, he missed him the first time.

4         There are -- there are tents there that are occupied, but

5    we're not --

6              **THE COURT:**  All right.  Let me ask Mr. Shapp this.

7              **MR. SHAPP:**  Yes.

8              **THE COURT:**  If I said -- I know it's still in

9    dispute, but this list of at most 19 people, if they're exempt

10   from being moved, that won't affect -- you strongly believe

11   they're not there, so it's kind of irrelevant, right?

12             **MR. SHAPP:**  That's our best information, Your Honor.

13        But frankly, Berkeley Homeless Union and its members can't

14   manufacture this issue by moving in and out of areas that are

15   noticed.  It completely undermines the relief that the Court

16   granted a narrow set of people.  If folks are simply allowed to

17   move into an area and then basically make it off limits to City

18   action, when they weren't there before, then it becomes

19   impossible to actually conduct the actions that the Court

20   allowed on June 10th, which is to provide one week's notice to

21   require people to move.

22             **THE COURT:**  Well, let's do this.  I will allow --

23   hold on.

24        I will allow the City to go forward.  I will include the

25   list of 19 for now, and when you go forward on Monday, chances

1    are if your view is correct, it will be moot.  None of them

2    will be there and that area will be clear.

3        Hold on.

4            **MR. PRINCE:**  I'm sorry.

5            **THE COURT:**  If in fact there is somebody there, then

6    you can come back to me and say, hey, Mr. White is there, how

7    do you want to rule, Judge, on this question.  Then I have to

8    determine whether they qualify for protection, because my

9    injunction did say those who resided as of the date of the

10   injunction, we may have to -- I may have to make a

11   determination whether they're entitled to -- if it's beyond the

12   eight, now the issue is teed up.  You have never brought that

13   to me for adjudication.  If I have to adjudicate that for

14   purposes of this, I will.  Chances are it sounds like this will

15   all be moot.  You can move the -- I'm allowing them to move the

16   people that I've identified, six people, no overlap with this

17   list.  And if Mr. White is there, come to me and I'll resolve

18   it in a day.

19           **MR. SHAPP:**  Your Honor, to that end, we would request

20   a date certain by which the parties could file some kind of

21   joint status update on this issue of the interactive process,

22   who is entitled to the interactive process under the June 10th

23   order.

24           **THE COURT:**  And I'm going to address that in a

25   minute, too, because I know that the -- it looks like your

1  mediation efforts have not borne fruit, so I want to figure out

2  how we're going to come to closure on the interactive process.

3  But I'm going to talk about that in a minute, but I want to

4  resolve this question.

5       So if I did that, Mr. Prince, what's the problem?  What's

6  the harm?

7            **MR. PRINCE:**  Well, first of all, Mr. White -- we did

8  not move anyone.  We don't move people in and out of anyplace

9  in order to get some kind of standing.

10           **THE COURT:**  And I said if he's there --

11           **MR. PRINCE:**  Correct.

12           **THE COURT:**  -- he will be exempt for now.  You guys

13  come to me on Monday or Tuesday, whatever it is, and say, we've

14  got a problem, Mr. White is there, and I'll have to decide

15  whether he's protect or not.

16           **MR. PRINCE:**  The problem, Your Honor, is that at any

17  given point someone may not be there.  I just, you know,

18  Mr. Garroway (phonetic) -- Mr. Garro's (phonetic) declaration

19  said he came one day, the guy wasn't there.  He came another

20  day, the guy wasn't there.  At any given time -- and this is

21  what the City does.  They'll say, we can't find his person,

22  he's not there, and therefore he's not in the encampment.

23           **THE COURT:**  You're not listening to me.  I just said

24  they will take the action on Monday.  Whoever's there is there

25  or not there.  So they've got notice.  The notice has been

1    posted.  If one of those who are there happens to be one of the

2    eight or one of the 19, bring it to me and I'll adjudicate that

3    question.  It may be that Mr. White is not entitled to

4    protection under my injunction.  It may be that he is.  I don't

5    know.

6         **MR. PRINCE:**  Okay.  I get it.

7         **THE COURT:**  But if he's not even there, then we don't

8    have to go through this, you know, unless we have to.

9         **MR. PRINCE:**  I understand what you're saying now.

10       The other point, though, I have to stress, Your Honor, is

11   that this notice that's out there now -- and it's not just

12   limited to that area.  It has made the rounds.  It is known

13   throughout the entire encampment.  People are now under the

14   impression that on September 15th they have to be out of there.

15       **THE COURT:**  Well, that's why I said I'm going to

16   issue the ruling within an hour from here, get it out.  You can

17   show people this is what the Judge ordered and this is -- and

18   the Judge is confirming exactly what Mr. Shapp told me, that

19   the action plan on Monday is half a block, one side of one

20   block.

21       **MR. SHAPP:**  Your Honor, I feel that I need to clarify

22   one point here, because Mr. Prince is talking about the other

23   folks' understanding of what the action is.  The compliance

24   deadline is set for Monday, but for operational and security

25   reasons we do not necessarily act on the exact day that the

1  compliance deadline is set, but it will be within a few days of

2  the 12th.

3          **THE COURT:**  Okay.  But the plan action, the main

4  thing is the geographic scope.

5          **MR. SHAPP:**  Yes, thank you.

6          **THE WITNESS:**  And if you're going to do anything

7  else, you gotta give the notice.  And, you know, this -- the

8  next round if they want to move out another block they've got

9  to give the week's notice.  That will give you a chance,

10 Mr. Prince, to come back and say, hey, we got a problem or

11 whatever.  But my original injunction does stand.  I have to

12 say it's limited.  It is limited in its reach because of the

13 Supreme Court's actions in *Grants Pass*.  So I've already

14 adjudicated that.

15      But in any event, you know, that's what the purpose of the

16 notice is, give people a chance and give you a chance to come

17 back to me and say there's a problem.

18         **MR. PRINCE:**  Okay.  So just so I understand, Your

19 Honor, we definitely need to resolve this issue of who's

20 protected under the -- so you want us to address --

21         **THE COURT:**  Well, let's figure that out now.  We

22 should figure that out, and for the people who aren't in the

23 process, how do we come to a conclusion on that.

24      So with respect to the -- I guess what, there's 11 people

25 beyond or eight people or 10 people beyond the eight?

1           **MR. PRINCE:**  That's correct, Your Honor.

2       Now, I will say that there are people, Adrien Bouchard and

3   Nick Johnson, of course as you're aware, that case, they were

4   provided an accommodation pursuant to the settlement there, and

5   there's one or two others whose status has been changed.  But,

6   so there's probably maybe three, three or four at most.  Not at

7   most, probably three or four, probably at most.  But there's at

8   least -- only the City's only recognizing that eight are

9   protected and not the rest of the group, which did have the

10  applications in on June 10th when the order was issued and

11  would have been physically in that encampment had it not been

12  for the June 4th raid --

13          **THE COURT:**  All right.  So this is what we'll do.

14      For those people in addition to the eight and out of this

15  group of 19 -- it's going to be less than 19 because some

16  people have settled -- submit, you know, we'll just call it a

17  motion, motion to include within the preliminary injunction.

18  What you'll have to show is according to my terms of the

19  preliminary injunction, that they had made a request for

20  accommodation and that they were residing in the affected area

21  as of the date of my order, so they should have a declaration

22  or whatever proof you can get.

23      Then I'll give the City a chance to respond, says, no,

24  they weren't there, here's a survey, blah, blah, blah, and I'll

25  have to make a determination.  If I have to do a little

1    evidentiary hearing, maybe I'll do that or I'll just resolve it

2    on the papers.  I'll figure who's in and who's out.

3          MR. PRINCE:  Well, what we're saying, Your Honor, is

4    that many of them were not there, because as of June 4th they

5    were pushed out and were hesitant to return.  And so they're

6    scattered throughout that larger area that they've now noticed

7    for September 15th, but I understand your order with regard to

8    that.  But they're scattered without.

9       The City is trying to say that they had to be physically

10   there, but at any given -- they weren't because of the City's

11   own misconduct on June 4th.

12         THE COURT:  Well, all right.  That raises a different

13   issue.  Now, you're saying because of -- they weren't there

14   because of the City's action, or they were there on the 4th but

15   no longer there because they were pushed out, they should be

16   given status because they were actually there but for the

17   City's action.

18         MR. PRINCE:  Correct.

19         THE COURT:  So you all --

20         MR. SHAPP:  Your Honor, if I may?

21         THE COURT:  Yeah.

22         MR. SHAPP:  I mean, we have understood Mr. Prince's

23   point since June 13th when he raised it with us, and we tried

24   to provide a joint status report to the Court at that time, a

25   joint motion for clarification on this issue, in June.  But he

```
1   chose not to move forward with that process at that time, and
2   so we're here now discussions it without any kind of notice or
3   briefing or proper argument to the Court.
4           THE COURT:  That's why I'm setting up a briefing
5   schedule.
6           MR. SHAPP:  Thank you, Your Honor.
7           THE COURT:  I may or may not accept the argument.  I
8   understand the argument.  There's an equity argument that but
9   for the City's action, they would have been there.  Almost they
10  were constructive -- you know, I understand that argument.
11  I'll have to -- and you probably have a counterargument.  I
12  will consider both.  But I need facts.  You know, I need
13  declarations saying this.
14      So I'm going to give you, what do you need, a week, two
15  weeks, Mr. Prince, to file a motion with declarations?
16          MR. PRINCE:  Well, let me just say one thing and I'll
17  comb the record.  I believe we do have declarations already,
18  detailed declarations.
19          THE COURT:  Okay.  Well, you can put it together
20  again.
21          MR. PRINCE:  We'll do that.
22          THE COURT:  It's up to you.  I'm just giving you a
23  chance to support your motion.  Without evidence it's hard for
24  me to rule in your favor.
25          MR. PRINCE:  Yeah.
```

1     **THE COURT:**  Give the City a chance, a week, two weeks

2  after you file to submit counter declarations and your counter

3  arguments.  Then I'll either set a hearing.  I'll rule on it so

4  we got clarity who's covered, who's not.

5     **MR. SHAPP:**  Your Honor, yes.

6     Your Honor, it's not just a question of who's covered from

7  the City's perspective.  There's also related to the settlement

8  discussions that have broken down is that there's also the

9  question of whether or not the interactive process has

10  concluded as to any of those individuals, and we would like the

11  opportunity to bring that to the Court as soon as --

12     **THE COURT:**  Well, okay.  So that's the second phase

13  that I want to talk about, and what I intend to do is this.  I

14  intend to order the parties to, within the next 45 days, to

15  complete the interactive process, whatever that process is.  It

16  may not be much.

17     I will rule now that that does not have to be in person.

18  I know that's been a sticking point, but it can be done.

19  There's no right under the ADA to have an in-person interactive

20  process.  It can be done by Zoom, or telephone or other means.

21  But what I want, what's critical at the end of that process, I

22  want your both -- your final positions.  The City says here's

23  where we can offer, this is the best we can do, I want to hear

24  from the plaintiffs, here's what we demand is the least we can

25  take, and then I will rule whether the interactive process has

1    been completed and complies with the ADA, or has not, or

2    whatever I do, we need to come to a conclusion.

3         So I'm going to give you, you know, the 45 days to

4    complete the process.  Then you report to me for each one who's

5    been engaged what the last position was, what the offer, what

6    the counteroffer was, and I'll make a decision about what's

7    reasonable and what's not.

8              **MR. PRINCE:**  I think I understand your orders, Judge.

9         I will say that I believe that, and I'll try to find the

10   case law, I believe there is a right for the person who's

11   seeking the accommodation to personally participate in the

12   process.

13             **MR. SHAPP:**  Yeah, we have no problem with the

14   individuals --

15             **MR. PRINCE:**  Can I make my point, Counsel?

16             **THE COURT:**  Make your point and then let Mr. Shapp.

17   Go ahead.

18             **MR. PRINCE:**  Yes.

19        So I'm just saying with regard to -- and maybe we could

20   get that done a little sooner than later so that that's taken

21   into consideration, because you're issuing an order it's okay

22   not to have that.  So if that's okay, I'll try to get something

23   quickly put together on that.

24             **THE COURT:**  All right.  If you -- you think there's

25   authorities that I'm missing, why don't you submit that within

1  the next week.

2          **MR. PRINCE:**  Okay.

3          **THE COURT:**  Or maybe quicker than that.  How about by

4  Tuesday?

5          **MR. PRINCE:**  Your Honor, could I have a little bit

6  more time?  I actually today I have to take my daughter up to

7  Santa Cruz for school and we have to move stuff.  If I could

8  have a few more days on that, I'd appreciate it.  I mean, it's

9  going to take me a little while to get the -- to put that

10 together.

11         **THE COURT:**  It's a very specific question.

12         **MR. PRINCE:**  Yes.

13         **THE COURT:**  Are you entitled to an in-person under

14 the ADA, and there are cases say yes or no.  I don't need a lot

15 of briefing.  If you want 'til Wednesday, that's fine.

16         **MR. PRINCE:**  Yes, thank you.

17         **THE COURT:**  And then you know what's coming,

18 Mr. Shapp.  I'll let you look at their authorities, but you can

19 do the research in the meantime.  You can file something by

20 Friday.  I want to resolve that quickly, because I want this

21 process to go.

22      And then, you know, I want to know what -- you know, do

23 the interactive process according to the procedure which I will

24 determine, which is whether it's in-person or not.  And then I

25 want to see the final positions of each party and then I'll

```
 1    rule, because we gotta come to a conclusion on this.

 2        So in terms -- so that's on~-- that's by Wednesday and

 3    Friday.  And then the briefing on who's in, how long do you

 4    want to determine who's in with respect to these eight people

 5    or however many more people there are beyond the eight?

 6            MR. PRINCE:  Let me -- how long to brief that?

 7            THE COURT:  Yeah, because -- come up with whatever

 8    evidence you want to marshal on that.

 9            MR. PRINCE:  Okay.

10            THE COURT:  Do you need more than a week?  What do

11    you need?

12            MR. PRINCE:  I'm going to need more than a week not

13    only because of this family situation, but because I'm

14    scheduled for oral argument in the Ninth Circuit in the Vallejo

15    case, but we may -- there's been a change in the facts around

16    that case, so that may or may not go forward.  But that's still

17    a month away, and I don't want to -- obviously that doesn't

18    work if we want to move quickly.  I understand the Court's

19    concerns.  So, but maybe a couple weeks.  And so it would be

20    helpful, 10 days or a couple weeks.  If I can get it done

21    sooner, I will, but I hate to say I'm going to do something and

22    just unable to do it.

23            THE COURT:  I can give you 'til the 22nd.  That's 10

24    days.

25            MR. PRINCE:  Okay.  Thank you.
```

1      **THE COURT:**  And then the City can respond a week

2    after by the 6th.

3      **MR. SHAPP:**  Yes, Your Honor.  But since there's

4    agreement as to eight individuals, we would ask that the 45-day

5    period start immediately, because there's no need to delay as

6    to those who everybody agrees are subject to the Court's

7    injunction.

8      **THE COURT:**  Yeah, I want that to go forward.  It may

9    be that you guys have already reached the end of your rope and

10   there won't be a whole lot of interactive process.  But I will

11   say, you know, I will look at what the position is and what's

12   offered, and if it doesn't look like there's been a true -- I

13   have to make a decision whether that complies with the ADA.  So

14   I hope there's meaningful discussion.

15      **MR. PRINCE:**  Well, Judge, I'm a little confused.  I

16   want to make certain I understand.

17      So the -- I don't have a problem with going forward with

18   the eight persons, but, and we'll see if we can resolve the

19   question of whether they're entitled to actually personally be

20   there, but the ...

21      Jeez, I lost my thought.

22      **THE COURT:**  The other ones, if I include them, we'll

23   track those, you know.  They will be on a parallel track if

24   there's any -- if I decide that the others are entitled,

25   anybody else is entitled.  But we do want to get past the

1  eight, and what I'll do is I'm going to set a little more than

2  45 days.  I'll go to the end of October, October 31st, and that

3  gives us a little time to resolve this in-person thing or not.

4          MR. PRINCE:  Okay.

5          THE COURT:  I'll rule on that very quickly as soon as

6  I get your briefs next week.  And then interactive process.

7          So if you can report to me by the end of the 31st, and

8  what I want -- and I'll put this in an order.  I want you to

9  state your last and best position on what the accommodations

10  should be, and then I'll have to decide what to do.  I have to

11  rule on it or have a hearing, I don't know.  We'll figure it

12  out.  But we do want to reach some conclusion, because this has

13  now been pending for a long time.

14          MR. SHAPP:  Yeah.  Your Honor, it's not just been

15  pending for a long time, but as you know is in our briefing,

16  Mr. Prince raised this issue on June 13th about who is subject

17  to this, and he chose not to move forward with that.  The

18  Court, during the hearing on June 10th, set a process and

19  invited the parties to file a joint motion for clarification.

20  We participated in the meet and confer to do that, and

21  Mr. Prince just chose not to --

22          THE COURT:  Okay.  I understand that, but I'm

23  ordering the briefing now, so that's moot.  I understand it

24  should have been done long ago, but I want to make sure that we

25  get this right, so I'm going to set this briefing.  I'm not

1   going to extend it.  We're going to go forward with this.  So

2   there's a date, there's a sunset date that's clear at this

3   point, and so that's what I'm going to do.  I will get out an

4   order shortly about what we discussed today, including the

5   denial of injunctive relief on the condition, you know, with

6   certain conditions attached.  And I will set the briefing.

7   I'll memorialize the briefing schedule we just talked about.

8           **MR. PRINCE:**  Okay.

9           **THE COURT:**  All right.  That's what we'll do.  And if

10  there's a dispute come Monday, or whatever day you enforce, and

11  you find for instance there's a dispute as to whether one of

12  these 19 or 18 or 16 people are there, come to me with an

13  emergency motion and we'll hear it right away.  Okay?

14       All right.  Thanks, everyone.

15       (Proceedings concluded at 10:23 a.m.)

16                     ---o0o---

17              **CERTIFICATE OF REPORTER**

18       I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20  DATE:  Wednesday, September 17, 2025

21

22

23  _____

24  Stephen W. Franklin, RMR, CRR, CPE
    Official Reporter, U.S. District Court

25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERKELEY HOMELESS UNION, et al., <br> Plaintiffs, <br> v. <br> CITY OF BERKELEY, et al., <br> Defendants. | Case No. 25-cv-01414-EMC <br><br> **ORDER DENYING PLAINTIFF BERKELEY HOMELESS UNION'S EX-PARTE APPLICATION TO ENFORCE PRELIMINARY INJUNCTION AND HALT SEPTEMBER 15 ABATEMENT** <br><br> Docket No. 135 |

The Court held a hearing on Plaintiff Berkeley Homeless Union's ("BHU") emergency motion to enforce the preliminary injunction and halt Defendant City of Berkeley's ("Berkeley") September 15, 2025 abatement. Having considered the parties' submissions and arguments, the Court rules as follows.

## I.    SEPTEMBER 15, 2025 ABATEMENT

At the hearing, Berkeley represented that the only abatement activity it intends to undertake in connection with its September 8, 2025 notice is limited to the **east side of Eighth Street between Harrison Street and Codornices Creek** as stated therein. Berkeley's public notice was provided only to residents within the east side of that one block geographic zone.

Accordingly, Berkeley may proceed with clearing that limited portion of the indicated block. However, the Court orders that any persons listed in Exhibit B to the Declaration of Yesica Prado (submitted in support of Plaintiffs' Ex Parte Application) (see Ex. B, Dkt. 135-1), if they are found to reside in the affected block shall not be moved pending further order of the Court. If there is a dispute as to whether Berkeley's actions pursuant to the notice it gave affect any of the individuals listed in Exhibit B, the parties shall promptly notice an emergency hearing to this

1   Court for resolution.

2       With respect to the Harrison Street corridor areas outside the limited portion of the east

3   side of Eighth Street between Harrison and Codornices Creek, Berkeley remains bound by the

4   Court's June 10, 2025 Order, (Dkt. 104), including the requirement of providing at least one

5   week's notice before undertaking any abatement action.

6                           **II.    BRIEFING ON ADA INTERACTIVE PROCESS**

7       The parties are directed to brief the following issue: whether an individual claiming ADA

8   accommodations is entitled to an in-person interactive process, as opposed to a process conducted

9   telephonically, by videoconference, or through other means.

10      BHU shall file its brief by September 17, 2025.  Berkeley shall file its responsive brief by

11  September 19, 2025.

12                      **III.    MOTION TO EXPAND LIST OF PROTECTED INDIVIDUALS**

13      BHU may file a motion by September 22, 2025 to include additional individuals beyond

14  the eight that Berkeley concedes are protected by the preliminary injunction with respect to the

15  interactive process under the ADA.  Any such motion must be supported by **admissible evidence**

16  demonstrating that the individuals submitted requests for reasonable accommodations and resided

17  (or should be treated as resided) in the affected area as of June 10, 2025 the date of this Court's

18  injunction.

19      Berkeley may file its response by October 6, 2025. The Court will thereafter determine

20  whether to resolve the matter on the papers or to hold an evidentiary hearing.

21                           **IV.    STATUS OF ADA INTERACTIVE PROCESS**

22      With respect to the eight individuals whom Berkeley acknowledges are entitled to

23  preliminary-injunction protection and participation in the interactive process, the parties shall

24  complete the interactive process no later than October 31, 2025.

25      By that date, the parties shall file a joint statement identifying the status of the interactive

26  process and each party's last and best position regarding accommodations for each of the eight

27  individuals.

28  ///

United States District Court
Northern District of California

2

1        **IT IS SO ORDERED**.

2

3    Dated: September 12, 2025

4

5                                                    _____

6                                                    EDWARD M. CHEN
                                                     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERKELEY HOMELESS UNION, et al., | Case No. 25-cv-01414-EMC |
| Plaintiffs, | |
| v. | **ORDER ON RULINGS RELATED TO AUGUST 5, 2025 CASE MANAGEMENT CONFERENCE** |
| CITY OF BERKELEY, et al., | |
| Defendants. | Docket No. 104, 107, 118 |

The Court orders the following:

1. The parties shall engage in settlement discussions with Judge Illman, including but not limited to individual ADA claims;

2. The preliminary injunction shall be extended until the parties complete the ADA interactive process or until further order; and

3. The pending motions (Defendant City of Berkeley's Motion to Dismiss at Docket No. 107 and BHU's Ex-Parte Application Requesting Order to Show Cause Why Defendants Should Not Be Held in Contempt for Violating Preliminary Injunction at Docket No. 118) are stayed pending resolution of the ADA interactive process or until further order.

Accordingly, the hearing on Defendant City of Berkeley's motion to dismiss scheduled for August 21, 2025 is vacated. August 5, 2025 case management conference minutes forthcoming.

**IT IS SO ORDERED**.

Dated: August 7, 2025

_____
EDWARD M. CHEN
United States District Judge

**Pages 1 - 16**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

```
BERKELEY HOMELESS              )
UNION, et al.,                 )
                              )
              Plaintiffs,  )
                              )   NO. 3:25-cv-01414-EMC
          vs.                  )
                              )
CITY OF BERKELEY, et al.,      )
                              )   (Amended)
              Defendants.  )
_____
```

San Francisco, California
Tuesday, August 5, 2025

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

For the Plaintiffs:

        LAW OFFICES OF ANTHONY D. PRINCE
        2425 Prince Street, #100
        Berkeley, CA 94705
   **BY:** **ANTHONY DAVID PRINCE, ATTORNEY AT LAW**

For the Defendants:

        CITY OF BERKELEY
        2180 Milvia Street
        Berkeley, CA 94704
   **BY:** **MARC AARON SHAPP, ATTORNEY AT LAW**

REPORTED REMOTELY BY:  Andrea Bluedorn, RMR, CRR
                    Official United States Reporter

Case: 25-7341, 02/25/2026, DktEntry: 19.2, Page 30 of 109
Case 3:25-cv-01414-EMC    Document 152    Filed 12/30/25    Page 2 of 16

2

```
 1  Tuesday, August 5, 2025                                1:33 p.m.

 2                      P R O C E E D I N G S

 3                          ---o0o---

 4        COURTROOM DEPUTY:  Court is calling case Berkeley

 5  Homeless Union, et al., versus City of Berkeley, et al.  Case

 6  number 25-1414.

 7        Counsel, please state your appearance for the record

 8  beginning with the plaintiff.

 9        MR. PRINCE:  Thank you.  Anthony Prince appearing for

10  Berkeley Homeless Union.

11        THE COURT:  All right.  Thank you, Mr. Prince.

12        MR. SHAPP:  Good afternoon, Your Honor.  Marc Shapp

13  for City of Berkeley.

14        THE COURT:  All right.  Thank you, Mr. Shapp.

15        So we have on calendar a -- the City's motion to

16  dismiss to be heard this month, correct, August 21st?  Is that

17  right?

18        MR. SHAPP:  Yes, Your Honor.

19        THE COURT:  And would the parties have agreed to do --

20  according to your joint statement -- is exchange initial

21  disclosures by the 15th of this month.  The proposal is to

22  have -- there's some proposed dates if we were to go forward,

23  and there's -- the case remains to be adjudicated.  A fact

24  discovery cutoff of February 5 with the trial sometime in

25  October of 2026.  That's was being proposed.
```

Case: 25-7341, 02/25/2026, DktEntry: 19.2, Page 31 of 109
Case 3:25-cv-01414-EMC   Document 152   Filed 12/30/25   Page 3 of 16

3

1          **MR. SHAPP:**  Yes, Your Honor.

2          **THE COURT:**  And, Vicky, I don't know if you had a

3   chance to look.  Is there a trial calculation?  How are we

4   looking calendar wise?

5          **COURTROOM DEPUTY:**  There is, Your Honor.  Do you want

6   me to email it to you real quick?

7          **THE COURT:**  Yeah.  I'm having trouble accessing -- for

8   some reason it's not coming through.

9          **COURTROOM DEPUTY:**  It just went through, Your Honor.

10         **THE COURT:**  That's to my court address.  Right?

11         **COURTROOM DEPUTY:**  Yes.

12         **THE COURT:**  Oh.  Well how are we looking for October?

13         **COURTROOM DEPUTY:**  We are available that date.

14         **THE COURT:**  And does the February 5th date align or

15   cut-off --

16         **COURTROOM DEPUTY:**  Let me pull it up.  I just sent it.

17         **THE COURT:**  Oh, here it is.  Actually, that calls for

18   an earlier cut-off.  Doesn't it?

19         **COURTROOM DEPUTY:**  Yes.

20         **THE COURT:**  No.  It actually calls for a later cut-off

21   so that works.

22         **COURTROOM DEPUTY:**  There was an earlier cut-off and

23   that was the I believe MSJ.

24         **THE COURT:**  Okay.  We can adjust that.

25         **COURTROOM DEPUTY:**  Okay.

Case: 25-7341, 02/25/2026, DktEntry: 19.2, Page 32 of 109
Case 3:25-cv-01414-EMC    Document 152    Filed 12/30/25    Page 4 of 16

4

```
 1            THE COURT:  All right.  So it looks like October 5th

 2    is available.  And so I will -- if there's no objections, get

 3    out a scheduling order in accordance with that.

 4            MR. PRINCE:  Excuse me, Your Honor.  Is that for

 5    trial?

 6            THE COURT:  That's for trial.  That's what the parties

 7    proposed.

 8            MR. PRINCE:  I should let you know that we -- I was

 9    notified by the Ninth Circuit just a couple of days ago that

10    October date -- they set October 10 as the day they're going to

11    hear argument in the case of Alfred versus City of Vallejo.  I

12    know if we have our trial five days before that, I guess --

13    hopefully -- I think the case will resolve well before that

14    but, in any case, I just wanted to let the Court know that's

15    going to be kind of a difficulty for me.

16            In any event, it might be -- it may be slightly after

17    that date and might be better or perhaps -- I don't want to get

18    any earlier.  I'm just letting you know this is --

19            THE COURT:  When is your hearing?

20            MR. PRINCE:  Pardon me.

21            THE COURT:  When is your Ninth Circuit hearing?  What

22    date?

23            MR. PRINCE:  October 10th.

24            THE COURT:  Of 2026?

25            MR. PRINCE:  No.  This -- oh, I'm sorry.  I apologize,
```

Case: 25-7341, 02/25/2026, DktEntry: 19.2, Page 33 of 109
Case 3:25-cv-01414-EMC    Document 192    Filed 12/30/25    Page 5 of 16

5

1    Your Honor.  I don't know.  I'm sorry.

2         **THE COURT:**  That was October 5th, 2026.

3         **MR. PRINCE:**  Yeah, no, it's this year.  I'm sorry.

4    Strike that.

5         **THE COURT:**  I made that mistake as well.  All right.

6    So we'll get out a scheduling order accordingly.

7         What I do want to address is the situation that's

8    currently evolved.  I'm not here to necessarily adjudicate this

9    motion that was recently filed regarding OSC regarding contempt

10   but I want to make sure we get things on track so I want to use

11   this opportunity to find out what is happening with respect to

12   the interactive process.  How many folks, first of all, are --

13   have requested accommodations and what's their status, where

14   are they living at this point?

15        **MR. PRINCE:**  Well, Your Honor, the list that we put

16   together had about 15 people that had filed applications for

17   reasonable accommodations at the -- and they were in -- all of

18   them were there in the encampment prior to June 4th.  After

19   June 4th, the population has been cut dramatically.  A lot of

20   people left because of the police action there, and so they're

21   not -- not physically in the camp but were kind of in and out.

22        But to answer your question, we had -- I think our

23   list was 15.  The City indicated they disagreed with that

24   number.  I think the City is taking the position that your

25   order indicated that it applied to those who had applications

1    on file and were in -- at 8th and Harrison on June 10th, the

2    day you issued the order.

3         However, as I say, six days earlier, because of that

4    action, although they had applications in and would have

5    otherwise been there on June 10th, at least half of those were

6    not there so the City is taking the position I believe that

7    they're not covered by your order and so that's something we

8    need to look at.

9         But we had 15 --

10        **THE COURT:**  So in terms of those who were there on the

11   10th, they're about half of those, seven or eight?

12        **MR. SHAPP:**  Yes, Your Honor.  The City identified

13   eight individuals that we agreed were at the location on the

14   10th.  And we spoke with Mr. Prince about filing -- as Your

15   Honor had indicated we should -- a joint request for

16   clarification at that point.

17        But that process never moved forward with Mr. Prince.

18   So no such joint request was ever filed on that issue or on the

19   issue of Judge Illman's involvement in the interactive process

20   and so we proceeded with -- we proceeded by offering dates when

21   the City was available for in-person interactive process

22   meetings for the eight individuals that the parties did agree

23   were subject to the Court's order, and I believe only three of

24   those have been -- gone forward so far despite multiple

25   attempts to schedule --

```
 1          THE COURT:  So there have been three meetings out of
 2   the eight?
 3          MR. SHAPP:  Yes.  And despite the lack of in-person
 4   meetings, we have also been consistently emailing Ms. Prado as
 5   the BHU representative on behalf of the individuals whose
 6   interactive process is still ongoing.
 7          THE COURT:  Right.  But none of those interactive
 8   processes have taken place under the apsis of Judge Illman at
 9   this point.  Correct?
10          MR. SHAPP:  Correct.
11          MR. PRINCE:  Can I address that, Your Honor?
12          THE COURT:  Yes.
13          MR. PRINCE:  And, yeah, and some of the things counsel
14   just indicated are not accurate.  We -- at the very outset soon
15   after your order, we indicated that we'd like to have Judge
16   Illman.  You had indicated he would be made available to deal
17   with individual processes -- you know, accommodations for the
18   individuals under the order.
19          The City took the position that that would have to be
20   mutually agreed, and it was my recollection that the mutual
21   part was when I tried to indicate that maybe Judge Illman could
22   help us settle the whole case, and you indicated that that
23   would have to be by mutual agreement.  But with regard to Judge
24   Illman being available to help with these individual cases, the
25   City has simply taken the position they're not going to -- they
```

Case: 25-7341, 02/25/2026, DktEntry: 19.2, Page 36 of 109
Case 3:25-cv-01414-EMC    Document 152    Filed 12/30/25    Page 8 of 16

8

1    think that --

2            **THE COURT:**  Yeah, no, I understand that.

3            **MR. SHAPP:**  And, Your Honor, we offered -- we gave our

4    written position to Mr. Prince for the joint request for

5    clarification and he never moved forward with that or filed --

6            **THE COURT:**  I'm going to rule on that in a minute but

7    what I want to know is is it true there have been three

8    meetings at least held and had that resulted in anything?

9            **MR. SHAPP:**  I believe there have been four meetings

10   actually that have been held and they have not, to my

11   understanding, moved the process forward meaningfully from

12   where they were with the written emails which is that the

13   individuals have requested either an indefinite stay at their

14   current location or some kind of sanctioned relocation and

15   assistance in that process.  The City has responded that that

16   is not a reasonable accommodation and has offered alternatives

17   which have not been accepted, and so that is where the process

18   remains.

19           **MR. PRINCE:**  Your Honor --

20           **MR. SHAPP:**  And, Your Honor, there's a joint status

21   report that the Court ordered which is due on Monday.  And, you

22   know, we intend to provide Mr. Prince with our section,

23   hopefully we can get agreement from him it will be filed on

24   5:00 p.m. on Monday and the Court will have all of this

25   information as was required in the June 10th order.

Case: 25-7341, 02/25/2026, DktEntry: 19.2, Page 37 of 109
Case 3:25-cv-01414-EMC    Document 152    Filed 12/30/25    Page 9 of 16

9

1          **THE COURT:**  All right.  Let me hear from Mr. Prince.

2          **MR. PRINCE:**  Yeah.  First of all, Your Honor, the --

3     the interactive process was terminated unilaterally on the 21st

4     of July by email from Ms. Mattes.  Ms. Mattes is falsely

5     claiming that she was threatened by a 71 year old applicant for

6     the accommodations, Ms. Lewanda Parnell.

7          That did not happen.  That is a gross distortion of

8     what happened.  But, nevertheless, we have been notified that

9     as of that date there would be no more in-person meetings and

10    that -- and of course that interferes with our ability to

11    record the meetings which was part of your -- record the

12    process as part of your order.

13         But, more importantly, what the City has done, what it

14    is talking -- what it is trying to describe as a legitimate

15    interactive process is anything but.  They have -- their -- Mr.

16    Gregory has routinely denied the accommodations.  It is not

17    true that we have suggested a sanction encampment.

18         All we have asked -- I should say most recently the

19    thing we asked is for a list of those areas that Ms. Mattes sat

20    in court and -- and to answer your question -- indicated when

21    you said are there other places -- people leaving if Harrison

22    could go, and she said yes, and she has not retracted that

23    representation.  All we want is to know where they were, as the

24    City of San Rafael did in that case.  Just give us a map or

25    give us a list but that was her representation.

1      We're not asking for a sanctioned encampment.  We're

2  saying where can we go and the City already conceded there are

3  places to go.  There are other aspects to the process but the

4  -- we did have four meetings.

5      The first one we actually discussed and then

6  subsequently came to an agreement that the process would be

7  focused on in-person meetings where our people could actually

8  speak and we would have Oliva deBree, who has been treating

9  every one of the applicants for the last five to seven years.

10  She's a nurse practitioner, director of the Lifelong Medical

11  Organization, and her -- she's been present, we've only had

12  three.  The reason we had -- we couldn't get started right away

13  or we couldn't have more at the outset is Ms. deBree, her

14  schedule is such that really she's only available on Fridays

15  and part of Mondays.

16      So that was -- that was the -- and of course the City

17  has taken the position back and forth with emails that they

18  wanted medical documentation to show the nexus between why it

19  is the -- our people needed certain accommodations.  So it was

20  at the City's insistence that we get the documentation and

21  she's been at all three meetings and discussing in detail the

22  situation as she sees it and the medical aspect of it.  And so

23  there's -- a lot of this is covered in our motion for the order

24  to show cause, Your Honor, but it is our feeling that if Judge

25  Illman -- I understand you're going to rule -- a lot of these

Case: 25-7341, 02/25/2026, DktEntry: 19.2, Page 39 of 109
Case 3:25-cv-01414-EMC    Document 192    Filed 12/30/25    Page 11 of 16

11

1    things we wouldn't have had to bring the motion and I tried --

2    we did meet and confer.

3        I said we're not going to bring anything.  If you just

4    let Judge Illman come in and kind of be there and I think that

5    that will --

6        **THE COURT:**  Well, here is what I'm going to do.

7        **MR. SHAPP:**  Your Honor, there are a number of

8    misrepresentations by Mr. Prince --

9        **THE COURT:**  Okay.  I don't need to hear any more.

10        **MR. SHAPP:**  Thank you.

11        **THE COURT:**  I'm going to order -- I'm going to change

12    my order.  I'm going to order you so there's no doubt whether

13    you want to or not, go to Judge Illman.  I've already spoken to

14    him.

15        He's going to serve as a mediator and help you with

16    each of these requests for accommodations.  Also, Judge Illman

17    will set forth the ground rules whether they need to be in

18    person, whether they can be by Zoom, who is going to attend,

19    and the question about recordation.

20        If these are mediations before Judge Illman, he will

21    determine whether it's proper to record.  But I will tell you

22    right now his general practice is not to record because that's

23    the way mediation is and you've got the neutral in the room,

24    you don't need -- this is not the formal process.  This is a

25    mediation process.  And I want each side to -- and he's ready

Case: 25-7341, 02/25/2026, DktEntry: 19.2, Page 40 of 109
Case 3:25-cv-01414-EMC    Document 192    Filed 12/30/25    Page 12 of 16

12

1    to take your call to figure out a time when we can start this

2    process.

3         MR. SHAPP:  Your Honor, I need to lodge my objection

4    to this on a number of grounds.  First of all, Mr. Prince has

5    waited nearly two months to bring this to the Court despite the

6    Court's specific instruction to bring a motion for

7    clarification or motion for reconsideration at the hearing

8    nearly two months ago.

9         We're now five days away from the end of the Court

10   ordered interactive process and Mr. Prince sat on his hands the

11   entire time.  Also, Your Honor, I -- we -- the City takes the

12   position that a third-party neutral, especially a Federal

13   Magistrate Judge is not an appropriate interlocutor in an

14   interactive process.  This is not a settlement discussion

15   between the parties; this is part of the ADA process.

16        THE COURT:  I'm not asking him to serve as the

17   adjudicator.  I'm asking him to serve as mediator to facilitate

18   a resolution of the dispute that arises out of the interactive

19   process.  At this point, I haven't clothed him with the

20   authority to make any decisions.

21        He's here as a mediator.

22        MR. SHAPP:  Even so, Your Honor, I don't believe that

23   the ADA regulations provide for a third-party neutral in the

24   interactive process.  This is simply not what the ADA requires.

25        THE COURT:  Okay.  Mr. Shapp, I've heard your

1    objections.  They're overruled.

2         The ADA does not prohibit this court from implementing

3    its ADR program, and we have the full authority to implement

4    that program whether you like it or not so you're going to

5    participate in it.  It doesn't matter whether it's an ADA case,

6    antitrust case, employment case, we have the power to order the

7    parties to mediation so that's what I'm doing.

8         **MR. SHAPP:**  I understand, Your Honor.

9         **THE COURT:**  You're ordered to go to mediation under

10   the terms that will be set forth by -- by Judge Illman.

11        **MR. SHAPP:**  And will the Court issue a new preliminary

12   injunction order?

13        **THE COURT:**  Yes.  In order to preserve that mediation

14   process, I'm going to extend the injunction so that this

15   process can go forward.  And so I will get out an order

16   accordingly.

17        But the first thing you all should do is get on the

18   horn with Judge Illman and see if you can expedite the process

19   to see if you can resolve this.  But if it doesn't resolve,

20   then we'll have to figure out where we go from there, whether I

21   appoint somebody to serve as an initial adjudicator of the

22   interactive process, or whether I do it myself, or how we're

23   going to do this.  But I'd rather the parties meet and confer.

24        It sounds like what I'm hearing from Mr. Prince is

25   that the main accommodation -- if I'm not misunderstanding

 1   him -- is a request to figure out where can people go.  That

 2   is --

 3         **MR. SHAPP:**  It's a sanctioned encampment, Your Honor.

 4   It's a distinction without a difference.  To call it a

 5   sanctioned encampment or to say it's where they can go, it's

 6   what the City has always said they've asked for.

 7         He's denied it, but it's what he's asking for and --

 8         **THE COURT:**  I thought I heard the City say there are

 9   places -- whether you call it an encampment or not -- that

10   folks can go that are not prohibited by the ordinance.  So, I

11   mean, therefore, it's a fair question.  Now, whether you can

12   resolve that or not, I'm going to hand that off to Judge

13   Illman.

14         And what I'm going to do is schedule a follow up in,

15   let's say, 45 to 60 days for further status conference.

16         Vicky, can I get a date.

17         **COURTROOM DEPUTY:**  Yes, Your Honor.  Let me see what

18   date that is.  October 14th at 2:30, Your Honor.

19         **THE COURT:**  October 14th, 2:30 by Zoom.

20         And I'm going think about what the process -- to the

21   extent you guys can't resolve this, I'm going to think about

22   what process I want to put in place to get these questions

23   adjudicated so we can come to a conclusion on this.

24         **MR. SHAPP:**  And, Your Honor, excuse me, I just want to

25   make sure before the Court -- we have your attention.  What is

Case: 25-7341, 02/25/2026, DktEntry: 19.2, Page 43 of 109
Case 3:25-cv-01414-EMC    Document 192    Filed 12/30/25    Page 15 of 16

15

1    the status of this ex parte order to show cause then?

2            **THE COURT:**  I'm just going to stay that.  I'm not

3    going to do anything with that because my answer is what I've

4    just given you.  And my answer, ultimately, in a practical way,

5    will be to determine a process of adjudicating any disputes

6    that arise out of the interactive process, and I intend to do

7    that in an expeditious way so that will -- you know, unless I

8    see something -- I'm going to put it on hold unless you hear

9    otherwise.

10           And if I feel the need to reactivate it and demand an

11   answer, a response, until then, you don't need to respond.

12           **MR. SHAPP:**  Thank you, Your Honor.

13           **MR. PRINCE:**  Thank you, Your Honor.

14           **THE COURT:**  All right.  We'll see you in a couple

15   months.  Thank you.

16           **MR. PRINCE:**  Thank you.

17               (Proceedings adjourned at 1:53 p.m.)

18                       ---o0o---

19

20

21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3            I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Thursday, November 20, 2025.

7

8

9

10

11                             _Andrea K Bluedorn_
                               _____
12                             Andrea K. Bluedorn, RMR, CRR
                               Official United States Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

ER-44

# OFFICE OF THE CLERK
# UNITED STATES DISTRICT COURT
## Northern District of California

### CIVIL MINUTES

**Date:** August 5, 2025          **Time:** 1:31-1:51          **Judge:** EDWARD M. CHEN
                                   20 Minutes

**Case No.:** 25-cv-01414-EMC          **Case Name:** Berkeley Homeless Union v. City of Berkeley

**Attorney for Plaintiffs:** Anthony Prince
**Attorneys for Defendants:** Marc Shapp

**Deputy Clerk:** Vicky Ayala                    **Court Reporter:** Andrea Bluedorn

### PROCEEDINGS HELD VIA ZOOM WEBINAR

Status Conference - held

### SUMMARY

Parties stated their appearances.

Parties have agreed to complete initial disclosure by 8/15/2025.

Defendant noted that they will provide status update to the Court by 8/11/2025.
Under NDCA ADR L.R. 3-5(d)(2), Court ordered parties to return to Judge Illman, who will
serve as a mediator to facilitate a resolution of disputes that arise out of the interactive process
and mediate individual ADA claims. Court indicated that Judge Illman will set ground rules for
mediation and will likely not permit recordation. Court directed parties to meet and confer and
schedule a time to initiate this process.

Court extended the preliminary injunction until the completion of the ADA interactive process.

Court stayed BHU's Ex-Parte Application Requesting Order to Show Cause Why Defendants
Should Not Be Held in Contempt for Violating Preliminary Injunction. *See* Docket No. 118.

Court to hold the motion to dismiss hearing scheduled for 8/21/2025 in abeyance pending
resolution of the ADA interactive process.  Court set a 10/5/2026, trial date.  Scheduling order to
issue.

**CASE CONTINUED TO:  10/14/2025, at 2:30 PM for a Status Conference via Zoom.**  Joint
status report **due by 10/7/2025.**

```
                            Pages 1 - 61

                   UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

BERKELEY HOMELESS UNION, et      )
al.,                             )
                                 )
              Plaintiffs,         )
                                 )
   VS.                           )   NO. C 3:25-cv-01414-EMC
                                 )
CITY OF BERKELEY, et al.,        )
                                 )
              Defendants.         )
_____ )
```

San Francisco, California
Tuesday, June 10, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        LAW OFFICES OF ANTHONY D. PRINCE
        2425 Prince Street - # 100
        Berkeley, California 94705
    BY:  **ANTHONY D. PRINCE, ATTORNEY AT LAW**

For Defendants:

        BERKELEY CITY ATTORNEY
        2180 Milvia Street - Suite 1250
        Berkeley, California 94704
    BY:  **LAURA IRIS MATTES,**
        MARC A. SHAPP
        **DEPUTY CITY ATTORNEYS**


**Also Present:**    **Yesica Prado, Berkeley Homeless Union**
                  **Robbie Powelson, Berkeley Homeless Union**


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
            Official Reporter, CSR No. 12219

1   <u>Tuesday - June 10, 2025</u>                          <u>10:33 a.m.</u>

2                        P R O C E E D I N G S

3                           ---oOo---

4          THE CLERK:  All rise.  Court is now in session.  The

5   Honorable Edward M. Chen presiding.

6          THE COURT:  Good morning, everyone.  Have a seat.

7          THE CLERK:  The Court is calling the case Berkeley

8   Homeless Union, et al., versus City of Berkeley, et al., Case

9   Number 25-1414.

10         Counsel, please state your appearances for the record.

11         MR. PRINCE:  Good morning, Your Honor.  Anthony Prince

12  appearing for Berkeley Homeless Union.  And I'm accompanied by

13  two of our union officers from the union, as well as

14  Mr. Powelson, who's assisting us in the case.

15         THE COURT:  All right.  Thank you.  Good morning.

16         MS. MATTES:  Good morning, Your Honor.  My name is

17  Iris Mattes, and I'm representing the City of Berkeley.

18         THE COURT:  All right.  Thank you, Ms. Mattes.

19         MR. SHAPP:  Good morning, Your Honor.  Marc Shapp,

20  also for the City of Berkeley.

21         THE COURT:  All right.  Good morning, Mr. Shapp.

22         All right.  So we're on for the expedited motion by

23  the plaintiffs, BHU, for preliminary injunction.

24         And as you know, the standards for preliminary

25  injunction require, among other things, a showing of

```
 1    irreparable injury, and examines -- based on the balance of
 2    hardships, a showing of either a likelihood of success on the
 3    merits of the claims; or if the balance of hardships tips
 4    decidedly in favor of the plaintiff, then a lesser showing on
 5    the merits i.e., a showing that serious questions are raised
 6    may be sufficient --
 7             MR. PRINCE:  Excuse me, Your Honor.  I'm having a very
 8    difficult time hearing you.  You know, I got the hearing
 9    disability.
10             THE COURT:  All right.  Let me get closer to the mic.
11             MR. PRINCE:  Okay.  Thank you.
12             THE COURT:  So I was setting forth the standard for
13    preliminary injunction.  And I was reminding the parties about
14    what we call the sliding scale; depending on how the balance of
15    hardships tips, the showing by the plaintiffs must be either
16    that a likelihood of success or serious questions are raised.
17    And, of course, we consider the public's interest as well.
18             So let me lay the framework here.  In my view, the
19    balance -- for the reasons I previously stated, there is a risk
20    of irreparable injury here for all the reasons we've stated.
21    And I don't need to restate that.  When we have a breakup of an
22    encampment and dislocation of people, including people who may
23    have certain disabilities, there is a risk of irreparable
24    injury.
25             However, the balance of hardships in this case, while
```

1   perhaps they may tip slightly in favor of the plaintiff, do

2   not, in my view, tip sharply in favor of the plaintiffs, so as

3   to relieve the plaintiff of having to show a likelihood of

4   success on the merits.

5           I say that for a couple of reasons.  One is that this

6   encampment has been longstanding and here for a long time.

7   There's now substantial evidence in the record about the

8   issues, the problems that have evolved.  There's amicus filings

9   about those who have been collaterally affected, businesses,

10  et cetera.  And it seems to me that the City has made a fairly

11  substantial showing of problems that arise from an encampment.

12  And it is my view that the longer an encampment exists, if

13  there are continuing problems, the hardships to the -- to

14  the City increase, and increase over time.

15          On the other hand, the fact that there are folks who

16  depend on the ability to live in a community, in an encampment,

17  and to have mutuality of help and accessibility to services and

18  some stability, particularly if they have certain medical

19  conditions, is important.  But if there is sort of longstanding

20  announced plans to end and to remove the encampment, the

21  reliance interests begin to fade over time because there's fair

22  warning that this is not going to be a permanent situation.

23          Again, this is not to say there's no injury or

24  irreparable injury, but the weight of the injury, I think,

25  begins to diminish with notice and time, particularly when

```
 1   notices about the long-term plan of the City is given well in
 2   advance.
 3          So I do find that this is a case where the plaintiff
 4   must show a likelihood of success on the merits in order to
 5   obtain a preliminary injunction.  And so when I turn to the
 6   likelihood of success, the first question is standing, and I do
 7   want to hear the plaintiffs' response to the standing
 8   challenge.
 9          First of all, my understanding is that BHU is
10   asserting associational standing and not organizational
11   standing.  I didn't see any briefing on the part of the
12   plaintiffs on the other prong of standing, organizational
13   standing; is that right?
14      MR. PRINCE:  Yes, Your Honor.  There's -- I would say
15   there's not a complete --
16      (Reporter interrupts for clarification of the record.)
17      MR. PRINCE:  Is this better?
18      THE COURT:  Yeah.
19      MR. PRINCE:  Okay.  Yeah, I would agree, Your Honor,
20   that we're asserting associational standing here, even though,
21   of course, the two aspects, organizational and associational,
22   are related.  But here, we're primarily asserting our ability
23   as to the union to file on behalf of our members --
24      THE COURT:  Okay.
25      MR. PRINCE:  -- of the camp.
```

1     **THE COURT:**  Okay.  All right.  Thank you for that

2  confirmation.

3         And the elements that are necessary for associational

4  standing are showing that the members of the association would

5  otherwise have standing to sue on their own right.

6         Number two, that the interest that the association

7  seeks to protect are germane to the organization's purpose.

8         And three, that neither the claim asserted nor the

9  relief requested requires the participation of individual

10  members in this suit.

11         I think it's clear to me that the first two elements

12  are easily met.  It's the third one that raises serious issues,

13  it seems to me.

14         And so maybe you can address -- my first question is

15  why isn't the third prong a problem here?  Because, for

16  instance, if you take the ADA claim, whether somebody has a

17  qualified disability, whether that disability has a nexus to

18  the -- to the harm that's being threatened and to the

19  reasonable accommodation that's sought, and whether the

20  reasonable accommodation -- or that the accommodation sought is

21  reasonable seems to hinge a lot on the individual circumstances

22  of what the condition is, what the proof is.

23         You know, there's a big difference between somebody

24  who has an injured leg or a leg that limits their mobility and

25  as to someone who has PTSD and requires certain conditions

 1  versus somebody who may have other mental limitations.  It

 2  seems like that's kind of a case-by-case situation and an

 3  example where that third prong of associational standing is not

 4  met.

 5          What's your counter there?  What's your argument?

 6          **MR. PRINCE:**  Well, Your Honor, I would say, first of

 7  all, that I would call the Court's attention to a very recent

 8  decision in the -- in the case of, well, it's a lawsuit brought

 9  against Kristi Noem, who is the federal government head of the

10  Department of Homeland Security and -- or Homeland Security,

11  excuse me, Your Honor.

12          And that was a case where President Trump abrogated a

13  collective bargaining agreement for approximately -- a

14  substantial number -- I think as many as perhaps 30,000 members

15  of the various unions who represent the transportation security

16  administration workers.  The reason I bring it up -- and I'll

17  get the cite for you, Your Honor; it was just decided in the

18  last couple of weeks -- this injunction was handed down just in

19  the last couple of weeks.

20          And the issue there is that the -- the abridgment of

21  the collective bargaining rights was something which showed --

22  which the -- the Court talked about the fact that the contract

23  won't exist, retirement benefits, all the rest of it.  And so

24  there's both -- it would definitely impact individual members

25  of the union differently.  They have different length of

```
1    service.  They have different wages.  You know, the different

2    job classifications --

3          THE COURT:  Well, it may be that the damages may be --

4    the consequences, financial consequences may be individualized.

5    But whether or not there was an unlawful abridgment of the

6    collective bargaining agreement is a single question that

7    affects everyone.

8          MR. PRINCE:  Well, I was going to say, Your Honor,

9    we -- we feel that the single question facing that there's --

10   well, the point I was trying to make here is that I don't think

11   the fact that there are individualized considerations -- and I

12   understand what you're saying about damages in the case -- the

13   Noem case is -- is not at -- necessarily in conflict with a

14   simultaneous finding that there is a collective interest as

15   well for which the union, as the association, can represent all

16   of its members collectively.

17         I think that here, where it's true that there's

18   particularities with regard to each person's particular

19   disability, the fact of the matter is what they have in common.

20   And if we -- I think that the -- again, the Noem case, and

21   the -- we can -- I don't want to say generalize, but I think we

22   can say that, collectively, what we have here is a group of

23   union members who share the common characteristic of having

24   physical and psychiatric disabilities.

25         And that's sufficient for us to have associational
```

1  standing, that we can -- you know, we can sue on -- on their

2  behalf, and the -- that is not in conflict with -- and,

3  actually, the interactive process is a somewhat distinct

4  aspect.  That that's something that Your Honor is correct --

5  that that's a very individualized approach.  The interactive

6  process is about specific individuals.

7         But apart and aside from that, with regard to our

8  contention that what we have here is a 14th Amendment

9  state-created danger claim, the fact of the matter is,

10  collectively, all of them are going to be put at risk for

11  increased -- put at increased risk of harm if the City is able

12  to take the encampment down, people are dispersed and separated

13  from those necessary services that -- that you indicated are --

14  are a factor in this case.

15         **THE COURT:**  Let me ask, Mr. Prince, what -- and I

16  should have asked this first at the outset -- what is the

17  current -- what can you tell me about the current situation?

18         How many folks are -- after what happened on June 4th,

19  how many folks are there?  How many of the 18 or 19 people who,

20  as I understand it, had requested reasonable accommodation, are

21  there?

22         What's happening on the ground?

23         **MR. PRINCE:**  It's my understanding -- and we have the

24  two officers, Ms. Prado and Mr. Gilmore, here.  But it's my

25  understanding that approximately half of the persons that were

 1   at the camp prior to the police action on June 4th are -- are

 2   back there because they need to be close to those services, and

 3   there's no other safe place to be.

 4          So about half of them.  That number would be maybe

 5   approaching 25 or so, maybe 20, 21.  And then there's --

 6   there's another group that is not right in the -- the area that

 7   was defined as the encampment, just outside the encampment, a

 8   little frightened to go back in because they fear that there

 9   might be another police action of some kind.

10          So -- and the percentage of those that are in the camp

11   is the same percentage as we've maintained and provided

12   evidence all along that have disabilities.  And at least --

13          THE COURT:  Well, there was evidence that was

14   submitted that there are about 18 or 19 people who had

15   requested accommodations.  How many of those folks are still --

16   do we know -- that are still in the encampment?

17          MR. PRINCE:  Could I have one second, Your Honor.

18          THE COURT:  Yeah.

19                       (Conferring.)

20          MR. PRINCE:  Well, Ms. Prado tells me that, out of the

21   19 people that are back in the camp, 12 of them are persons

22   that have actually submitted official applications for

23   disability accommodations.

24          THE COURT:  Okay.  And what is the status of

25   Mr. White, Muwakkil, Keiser, and Moore?  There are specific

```
 1  documents I saw in there.

 2         What's happening with those four individuals?  Do we

 3  know?

 4         MR. PRINCE:  One of them here is in the courtroom,

 5  Your Honor, and that's Mr. White -- yeah, Austin White, who

 6  is -- they call him Draco; he's here.  I've been told that

 7  the -- that all three of those individuals, White, Moore, and

 8  Keiser --

 9         THE COURT:  Muwakkil --

10         MR. PRINCE:  Yeah, that they're all back in the -- in

11  that area that was previously --

12         THE COURT:  They're in -- they're still in the camp?

13         MR. PRINCE:  That's correct, Your Honor.

14         THE COURT:  And what is your understanding of their

15  present status of their request for accommodation?

16         MR. PRINCE:  As far as I understand it, the status for

17  their request is that the City, Mr. Gregory -- Thomas Gregory,

18  is the ADA coordinator for the City -- has taken the position,

19  which we strongly disagree with, both on the facts and the law,

20  is that he needs to have a specialist provide him with some --

21  some kind of certification; that while he recognizes their

22  disability, he -- he wants a specialist to opine as to how that

23  disability -- what nexus is there between the disability and

24  their inability to simply leave the camp.

25         And we have a very strong legal and factual
```

 1   disagreement with that position.  But it's being held up by

 2   Mr. Gregory's insistence on getting this additional --

 3   additional documentation.  This will be the -- we've seen this

 4   repeatedly in this case, and each time, more documentation is

 5   provided.

 6          We have it in, I think, one of the declarations that

 7   the principal care provider for many of these individuals was

 8   not available and is away out of town, or isn't still out of

 9   town -- I understand just came back, actually.  And so it was

10   impossible, even if it was legally required, which we -- we

11   dispute, to have -- to -- for that person -- I believe it's the

12   LifeLong street medical team, to provide that additional

13   information.

14          And so it's -- it's being held up by Mr. Gregory, who,

15   in -- in our view, has essentially denied accommodations based

16   on the fact that the law is, if there's repeated insistence for

17   additional documentation when the disability is obvious, the

18   nexus is obvious, someone with mobility -- a disability is

19   obviously going to be at a great disadvantage when the camp's

20   broken up.  And there's --

21          **THE COURT:**  Well, let me ask you.  Take mobility,

22   physical mobility, which is a more obvious limitation.  What is

23   the argument for the nexus as to why somebody with that

24   mobility has to be in the corridor as opposed to somewhere

25   else?

1          **MR. PRINCE:**  Well, Your Honor, I wouldn't necessarily

2     say that -- that they have to be in the corridor.  But the

3     inquiry here -- okay.  I -- I would say that, where are they

4     going to go that there won't now be an addition -- an

5     additional adverse impact arising from their disability?

6          You have -- for example, you have Frank Moore, who

7     is -- who is in the camp.  And he has a number of disabilities,

8     including an inability to comprehend things.  He has cognitive

9     issues.  And -- and yet, Thomas Gregory said:  Well, show --

10    what's the nexus between that and his -- and the need for him

11    to stay in the camp or his inability to leave the camp?

12         Well, It's obvious.  If he has an inability to

13    understand, comprehend, navigate his way through these things,

14    he's going to be put at greater risk of harm.

15         So we feel what that the City is doing here is -- to

16    some extent, the issue of the ADA is an issue in this case.

17    But in another sense, it is not, because whether or not people

18    have the disabilities -- our contention, as you know,

19    Your Honor, is the question that they're all going to be put at

20    increased risk of harm.

21         Those with the disabilities will simply -- not simply,

22    but they will have an additional burden of being now -- that

23    those disabilities are aggravated, and their ability to survive

24    outside of that community is -- is further compromised --

25         **THE COURT:**  Well, you're suggesting that the due

1  process right against state-created danger is worse for some

2  than others; right?

3         I mean, for Mr. Moore, you're saying because of his

4  cognitive and perhaps emotional limitations, he's going to be

5  more vulnerable than somebody who has, for instance, only a

6  physical mobility challenge.

7         **MR. PRINCE:**  I would say that's true, Your Honor.

8         But I would say that based -- I mean, my experience,

9  which is extensive, working on reasonable accommodations, all

10  type of disabilities, is that there's spectrums, and there are

11  spectrums within the spectrums.  And if you want to -- if we go

12  down the road of finding, "Well, that's different than this,"

13  at a certain point in time, it -- it makes no sense because you

14  can continually narrow down the framework of "This person's

15  different than that person."

16         It makes no difference.  If the common factor is that

17  they will not be able -- their ability to survive without the

18  food, without the medical care, without the rest of it being

19  centrally located, they can come in and take care of these

20  people and follow up with them -- they're going to be impacted

21  adversely no matter what.

22         **THE COURT:**  Well, that leads to the question:  What's

23  the limit of the doctrine?  That is, we've seen enough of these

24  now -- I've seen enough of these.  It's a very familiar

25  pattern.  There are people who have trauma and PTSD.  There are

1   people who have mobility limitations, people that have a

2   history of victimization, domestic violence, and various needs.

3   And there's always the question of centrality, of being able to

4   deliver medical services, food services, counseling, et cetera,

5   et cetera.

6          But that suggests -- and that seems to exist in every

7   substantial size encampment.  But that would suggest that

8   there's a constitutional prohibition against ever removing an

9   encampment because every time you do that, you upset exactly

10   the same thing you were saying -- we've heard the same thing in

11   Sausalito.  We heard the same thing in -- at -- you know, at

12   the encampment by the freeway off of 80.  Heard the same thing

13   in Novato.  We've heard the same thing in San Rafael.

14          And my colleagues are hearing it all over.  And I just

15   think it's a pretty hard sell to say that, notwithstanding what

16   the Supreme Court did in the *Grants Pass* case, that there's

17   still nothing that a city can do.

18          I mean, can you imagine a situation where a city could

19   ever remove an encampment?

20          **MR. PRINCE:**  Oh, yeah.  True, if they found housing --

21   non-congregate housing for every single individual, I guess

22   that would be one situation; but we know that that's probably

23   not realistic.

24          Well, I would say that that is not our position, that

25   there could never be a circumstance that a city could -- would

 1  be effectively, per se, prohibited from breaking up an

 2  encampment for the reasons you provided.

 3          I think that -- that the -- I would say two things.

 4  First of all, that under the *Munger* decision, what -- what

 5  might happen or what alternative there might be for -- for the

 6  person who's going to be impacted -- in this case, the

 7  residents of the encampment -- is irrelevant to the -- to

 8  the -- to the standard.

 9          The question is:  Immediately, has the City put these

10  people -- put people at risk?

11          Mr. Munger could have borrowed a jacket -- you know,

12  the guy that was put out in the winter storm could have gone

13  somewhere where it's warm.  The Court said none of these

14  things.  The question of agency is not the issue.  The issue

15  is:  Did these Government act affirmatively in such a way --

16          **THE COURT:**  So why wouldn't that be true just in every

17  instance of -- why wouldn't that be true in every instance when

18  you close an encampment?

19          **MR. PRINCE:**  Well -- well, I think that -- I think

20  that in some senses -- I wouldn't say every instance.  It

21  depends on the specific circumstances of a given encampment.

22          As you know, Your Honor, there's hundreds, perhaps

23  thousands, of encampments in this part of the state.  And not

24  all -- some of them don't have anything remotely comparable to

25  what we have over here at 8th and Harrison, where you've got --

1    you know, I count six different organizations -- medical,

2    church-based, and providers of survival items coming in on a

3    regular basis.

4            The camp has been in there -- has been there a long

5    time, and that's in large part because it is a

6    centrally-located place where these services can be provided.

7    That will -- that will not be the case.  And therefore,

8    those -- the residents will be put immediately at risk just

9    being evicted and dispersed and therefore separated from those

10   services.

11           The other point I wanted to make, though, Your Honor,

12   about your question about could the City never take an

13   encampment down, I think that the -- we -- as you know,

14   Your Honor, we don't favor, on a permanent basis, the

15   encampments.  We are for housing.  And, as you know, in the

16   examples you cited, the fact that we were able to stabilize for

17   a time -- in some cases, a significant period of time -- those

18   encampments -- Sausalito, San Rafael, and Novato -- that led to

19   housing.

20           They became areas where, again, the concentration of

21   people there -- caseworkers, housing providers, documents

22   prepared, and people kept safe and alive such that they could

23   complete that process.  Every one of our original named

24   plaintiffs in the Novato case was permanently housed.  And, as

25   you know, in Sausalito, out of the 30 most vulnerable, for

1   which the City agreed to pay over a half a million dollars

2   divided amongst those 30, two-thirds of them either got

3   apartments or were able to find some other durable stable

4   housing.

5           So we're not for the permanent existence of these

6   encampments, necessarily.  That is not our position.  But on

7   the one hand, the fact of the matter is that I think it can't

8   be disputed that their current situation is such that they have

9   it.  And the moment that they're evicted, they will not have

10  these things, and they'll be at risk of harm.

11          And the other thing, as I say, Your Honor, is that

12  we -- we would not -- I think that, in any -- let's say --

13  let's assume, for the sake of argument, that there is a

14  circumstance, which I could see, where the entire encampment

15  has to be broken up.  I could see that.  That's not in this

16  case at all, but I could see that.

17          Even there, Your Honor, it would seem to me that an

18  effort can be made, barring some -- some exigent circumstance,

19  where the parties first exhaust every possible avenue towards

20  seeing that people, if they have to leave, are put in no less

21  safe a place -- either a safer or no less -- but not any more

22  dangerous.  And that process could be expedited.

23          As you know, Your Honor, we submitted an

24  administrative motion to get the parties to the table and have

25  those discussions -- they could be of limited duration.

 1   They're not open-ended forever -- and get all the parties in

 2   the room, as we did in Sausalito.

 3        **THE COURT:**  What would some of those possibilities

 4   here look like?

 5        **MR. PRINCE:**  I'm sorry, Your Honor?

 6        **THE COURT:**  What would the possibilities here look

 7   like, given -- and I do want to hear from the City exactly what

 8   is available in terms of alternative housing, but, I mean,

 9   given the limited stock and the demand, what could that lead

10   to?

11        **MR. PRINCE:**  Well, Your Honor, we actually reported

12   this in the -- when we had the argument in Judge Gilliam's

13   courtroom.  And we had -- and I failed to bring it with me this

14   morning.  We went online and found that the City has

15   approximately 85 properties that it owns.  And they include --

16   about 35 out of those, maybe almost 40 of those 80-some

17   properties are listed as vacant lots, residential buildings,

18   and there's some -- one or two says "occupied."

19        The rest of them, there's no notation about them being

20   occupied.  We don't know what the status of these properties

21   are.  City Hall is standing there empty, surrounded by a fence

22   in a -- in a community where the City is insisting we have --

23   we can't offer any safe alternative.

24        We've had plenty of cities where -- where these

25   properties have been repurposed or -- and, again, for a

1    temporary basis, a dynamic process of actually sitting down and

2    saying, let's see if we can -- we can get people into some kind

3    of more durable safe housing situation.

4         If you recall, Your Honor, again, in Sausalito, not

5    only did we get the funding, but every one of our people had a

6    letter on City of Sausalito letterhead saying this is a person

7    with whom -- to whom you can rent an apartment.  The City of

8    Sausalito is supporting them with financial assistance and

9    otherwise.  And that was instrumental in -- in people getting

10   leases.  As I say, two-thirds of the 30 were able to get

11   housing along those lines.

12        What we're -- what we're saying here, Your Honor, and

13   I understand we're still on the question of, I guess, the third

14   prong of the associational standing, but I think -- I think,

15   Your Honor, that we go down the road too far, that we get away

16   from the whole purpose of an association, which is to represent

17   the -- the collective interests of the members of the

18   association and also to take care of the individual aspect.

19        And, I think, in this case, Your Honor, that we won't

20   even get to the individual aspects if we don't get some kind of

21   at least restraining order of some -- some duration to let that

22   process go forward.  We won't even get there, Your Honor, if

23   the camp is taken down, people are separated from these vital

24   services, food, medical care, and placed at an increased risk

25   of harm.

1          **THE COURT:**  All right.  Let me -- let me turn to

2   the City.  What is -- number one, what is the current situation

3   in terms of alternatives?

4          I know that the notices say, well, you know, here's a

5   number to call, et cetera, et cetera; but on the ground, what

6   is available at this point?

7          You can remove your mask if you want to talk.

8          **MS. MATTES:**  We are -- I'll just say, I'd like to just

9   go back slightly because this encampment has been in the city

10  for numerous years.

11         And, as the City laid out in its opposition, one in

12  five shelter offers that the City has made to encampment

13  residents in the city has been to residents of the Harrison

14  Corridor.  This is not a situation where the City has avoided

15  offering shelter.

16         Shelter has been made to Ms. Prado.  Shelter has been

17  made to other BHU members.  And a number of the people from the

18  Harrison Corridor have taken the City up on the shelter offers,

19  and others have not.  And so I wanted to make clear that, over

20  the years, since the City has tried to work with the encampment

21  residents, shelter has been a tool to --

22         **THE COURT:**  So what's available now?

23         **MS. MATTES:**  So -- and let me just say, so the

24  shelter, also, availability depends day by day, week by week --

25  because the City offers shelter to all of its unhoused

 1    residents.  And so we just tried to write to city staff to get

 2    the current availability.  Let me just read it.

 3              It looks like we have no vacancies for non-congregate

 4    shelter and --

 5              **THE COURT:**  And what is the non-congregate shelter?

 6              Is that the old hotel -- or a motel?  Or what is

 7    available?

 8              **MS. MATTES:**  Yes, the City runs -- the City has used

 9    its -- used a significant amount of money raised from

10    Measure P, which we put in the opposition, to essentially take

11    over the lease of two hotels.

12              **THE COURT:**  So those -- the non- -- at this point, in

13    Berkeley, the non-congregate options are in the two hotels that

14    you -- the City took over?

15              **MS. MATTES:**  I believe so.

16              **THE COURT:**  And none of those are available?

17              **MS. MATTES:**  Not at the moment.

18              **THE COURT:**  And then for congregate --

19              **MS. MATTES:**  Oh, I'm sorry.  It's four motels.

20              **THE COURT:**  Four.  And then for congregate, what's the

21    current situation for those shelters?

22              **MS. MATTES:**  It looks like there are -- I was told

23    four -- four open male beds and two open female beds.

24              **THE COURT:**  And are there any other options besides

25    shelters and the hotels for folks?

 1           MS. MATTES:  Options for?

 2           THE COURT:  For housing.

 3           MS. MATTES:  For housing?

 4           THE COURT:  Yeah, other than being on the street.  Is

 5      there anything else available?

 6           MS. MATTES:  I -- I guess I would say the only -- I'm

 7      not sure if I'm missing the question.  The only other option, I

 8      would say, is permanent housing, which the City does not

 9      manage.  The County manages permanent housing.

10           THE COURT:  And there's, like, a county waitlist or

11      something --

12           MS. MATTES:  There's a county -- yes.

13           The City -- so the City doesn't have permanent

14      housing.  That goes through the County.  And the City works

15      with the County to get folks into permanent housing.  But

16      the City does not manage availability of permanent housing.

17           So typically, for example, if the City were to offer

18      folks a stay at one of its motels, the City would then help

19      connect people to resources in the county to transition them

20      into permanent housing.

21           But I'll say -- I'll just say one of the reasons why

22      some of our noncongregate shelter can be limited is, in at

23      least some locations, there is no time limitation for the

24      noncongregate shelter.  And so, it's not that it's only

25      28 days, and you're out.  And so, some folks will remain in the

 1  non-congregate shelter for longer, which is why we've stated in

 2  our notices that shelter is available -- or shelter is only

 3  available if there is space.

 4       THE COURT:  So what -- what is going to happen if I

 5  were to allow the closure of this encampment to go forward?

 6  Where -- where can people go?

 7       MS. MATTES:  Well, Your Honor, the City of Berkeley

 8  does not have a no -- does not have a camping ban.  There are

 9  certain locations of the city where camping is not permitted

10  overnight, such as the parks, but the City doesn't have a

11  blanket "no camping" ordinance.

12       THE COURT:  So there's -- reference has been made to

13  the Ohlone Park that's adjacent.  Is that a -- is that a "no

14  camping" area?

15       MS. MATTES:  That park is a "no camping" area.  I

16  wouldn't say it's adjacent to the Harrison Corridor.  I think

17  it's about two miles away.

18       THE COURT:  So where -- because part of this is

19  assessing, you know, what are the harms?  At least under the

20  state-created doctrine, danger doctrine, one compares, at least

21  under the current state of law, what this current situation is

22  now for affected people, and what the alternative is going to

23  look like.

24       What's an example of where people could go?

25       MS. MATTES:  Well, I guess I would turn it around and

1    say that there -- actually, the City has only designated

2    certain areas where they can't camp overnight.  And in the --

3    it's sort of the absence of a limitation.  If there is no

4    limitation on camping in the city other than certain locations,

5    then I think our -- our position would be, you know, folks are

6    available and free to move in other locations where it may be

7    allowed.  We --

8            THE COURT:  So, you know the city better than I do.

9    Can you give me an example of what is not disallowed?  Where it

10   is allowed -- not in the park.  Okay.

11           Are all parks off limits?  Is there a citywide

12   ordinance that no parks -- there's no camping in any parks?

13           MS. MATTES:  I believe -- I -- I believe there is a

14   prohibition on camping in all parks.

15           THE COURT:  Okay.

16           MS. MATTES:  But I would need to confirm.

17           THE COURT:  So what would -- what's an example of

18   where people could go?  Are there empty lots?  Are there

19   streets?  Are there --

20           MS. MATTES:  There -- I guess, let me, if it's okay,

21   Your Honor, can we just pull back for one second, which is to

22   say that this -- the Harrison encampment corridor is not the

23   only encampment in the City of Berkeley.  That corridor does

24   not reflect the only individuals that are residing in our

25   streets.

 1          The reason the City has chosen to abate this

 2   particular encampment is because of the health and safety risks

 3   posed by the encampment.  So it's -- if this encampment were to

 4   be closed, the City has identified a narrow area of closure in

 5   order to abate that encampment and create a "no lodging" area.

 6          But as Mr. Prince said, folks have moved just outside

 7   the perimeter of that area very quickly and have reestablished

 8   themselves just outside the perimeter.  So --

 9          **THE COURT:**  And there's not -- there's not a current

10   plan by the City to, then, move these folks outside the

11   perimeter, wherever those -- that is now?

12          **MS. MATTES:**  At the moment, I'm not aware of a current

13   plan.  I think I'd like to focus -- what I'd like to emphasize,

14   that the City has chosen -- or has intended to move forward the

15   abatement of this because of the severe public health --

16          **THE COURT:**  No, I understand that.

17          **MS. MATTES:**  Yeah.

18          **THE COURT:**  But in your response, for instance, to the

19   asserted claim of state-created danger, you've taken, point by

20   point, their claims of danger, their claims of decrement.  One

21   is access to bathrooms, and you pointed out that there is

22   numerous bathrooms around the city, one at the sports complex,

23   et cetera, et cetera.

24          So my next question is -- just to drill down one more

25   level -- are there areas around -- you know, within walking

1  distance to the sports complex that folks would be safe from

2  eviction if they were to camp?

3        **MS. MATTES:** Right.  I -- I think what I could say --

4  I -- I don't want to misrepresent in the sense that the City

5  will never choose to close down another encampment should

6  public health or safety risks or other issues arise.

7        You know, I -- I do not believe that the City, at this

8  moment, under the current case law, is required to create a

9  sanctioned encampment area.  And we've made that very clear.

10  So there is -- I would not like anything I say to be

11  misinterpreted as, you know, this -- folks can move to this

12  block of the city, and that being a sanctioned encampment area.

13        But what I would say is, currently, the City has no

14  ban.  So this -- so, for example, related to the bathrooms,

15  you know, the City intends to close off a certain intersec- --

16  a certain location to lodging; but if you were to move a few

17  blocks down, that could put you closer to the bathroom that's

18  at the Tom Bates Sports Center.

19        I'll also note there are bathrooms in almost all of

20  our parks.  And so, those are scattered throughout the city.

21        I also would say that, you know, as to the

22  state-created danger, as -- as we've pointed out in our

23  opposition, the idea that services will not be provided to

24  encampment residents if this encampment is closed is false.

25  Our services are not provided on an encampment basis.  They're

1  provided on an individualized basis, which is why the City --

2  members of city staff meet with other city stakeholders that

3  provide shelter and medical services on a weekly basis to

4  discuss individual people's needs.  And those individuals are

5  followed around no matter where they're located in the city.

6         And so, the type of services in terms of trying to

7  transition people into shelter, trying to ensure they're

8  getting medical care, that happens on a weekly basis with

9  the City, regardless of where they're located.  So none of that

10 will go away.

11        And, you know, I -- it was stated in our opposition,

12 to the extent that they may get services from physical

13 location, such as the Dorothy Day House, that provides services

14 during the day, this encampment, I would not characterize as

15 close to the Dorothy Day House.

16        **THE COURT:**  No, I understand that.  Your map shows

17 it's about two miles away or something like that.

18        **MS. MATTES:**  Two and a half miles away.  That's right.

19        **THE COURT:**  Two and a half miles.

20        **MS. MATTES:**  So the -- the idea that services will not

21 continue to be provided, I think, is -- is demonstrably false.

22        **THE COURT:**  What is the current situation -- there's a

23 fair amount of back and forth on the brief about the

24 interactive process or lack of interactive process and

25 the City's insistence on documentation.  So, first, let me

1    clarify.

2          It appears from the correspondence that -- that the

3    documentation, when it is sought, is usually about showing that

4    a disability has a nexus to the need to be in this location and

5    not be moved somewhere else; correct?

6          **MS. MATTES:**  That's often -- that's often, you know,

7    we've received numerous requests.  And so I will say we take an

8    individualized approach to each request.  So sometimes nexus

9    information might be requested for other reasons.  But one good

10   example is, as Your Honor pointed out, to the extent people

11   state certain disabilities and then request the ability to

12   either remain in the encampment or move to another sanctioned

13   encampment, we request nexus documentation.

14         I'll also say, a number of individuals state that they

15   have severe mental disabilities -- mental health disabilities

16   or limitations.  It is not always obvious to the City -- even

17   if we accept that they have those disabilities it is not always

18   obvious not to -- to our ADA coordinator that there is a nexus

19   between their unobservable disabilities and their requested

20   accommodation.

21         And, if I may, I'd like to sort of underline this

22   issue of the ADA.  You know, at this point, we have been

23   engaging in ADA accommodation requests for over five months.

24   In Mr. -- in BHU's motion, they have not provided a single

25   declaration from an individual with a disability regarding

1    their ADA requests.  The only declaration we saw was that of

2    Yesica Prado, who states that there are 19 requests.

3         I wanted to underscore that Yesica Prado has sent us

4    numerous ADA requests.  And I don't believe that in any single

5    one of the numerous requests have we had any individual

6    participation from the underlying members.  They have all been

7    through Yesica as their -- as their proxy.

8         **THE COURT:**  Well, part of the claim is that the City

9    has required, as a threshold question, medical documentation

10   that is hard to get.  Therefore, that has not gone past Step 1.

11        **MS. MATTES:**  That's not true.  We've gone back and

12   forth on a number of requests.  And requests that are easy to

13   grant that don't require a nexus, we've granted.

14        So, for example, we've granted packing assistance.

15   When somebody states that they have a mobility disability,

16   we've granted packing assistance.  When somebody has said they

17   need a bit of extra time, we've granted them a bit of extra

18   time.  But at this point, we are entitled to really understand

19   the person's disability and the nexus between the request.  And

20   let me give you a few reasons why.

21        In our experience, and this is, you know, in speaking

22   to the ADA coordinator, he has done ADA outreach where he goes

23   out to encampments and speaks to individuals.  Everybody he

24   finds at the encampment.  Presents themself as the ADA

25   coordinator, lets them know an abatement action will -- will

1   proceed, and asks, you know, the individuals:  Do you have a

2   disability?  Do you have any reason why you wouldn't be able to

3   leave this encampment location at X date?

4           And people will say no.  People say, "No, I don't have

5   a disability.  No, I don't have any reason to leave.  I'll be

6   out in a week."  Variations of that sort.

7           So in -- in one instance, the ADA coordinator, I

8   think, went out three times to an encampment, had this speech.

9   Nobody requested an accommodation.  But weeks later, we get

10  e-mails from Ms. Prado on behalf of these people stating they

11  actually do have a disability, and they -- they can't --

12          **THE COURT:**  Has Mr. Gregory spoken to the 18 or 19 --

13  all the 18 or 19 folks that Ms. Prado says have submitted

14  requests for accommodation?

15          **MS. MATTES:**  I don't believe he's spoken to them, but

16  I can say that, at least in a number of requests, we have

17  offered to meet.  And I don't believe -- but I don't want to

18  speak out of turn -- but I don't believe anybody has taken

19  Mr. Gregory up on the offer to meet.

20          But -- and if I may, Your Honor, I think it's

21  important to really not lose sight of these individuals'

22  interests in this action.  Because I'd like to take just

23  Mr. Moore as an example -- because in BHU's brief, they cited

24  no -- they provided simply no individualized declaration or

25  documentation of any ADA process.  It was the City who

1    submitted Mr. Keiser, Mr. Muwakkil, and the other individual as

2    an example.  That was the City who submitted that

3    documentation.

4           And in reply, BHU, also through Yesica, provided

5    what -- you know, her summary of the ADA process involving

6    Mr. Moore.  And it was really interesting to see that because,

7    you know, if Your Honor remembers, this case was brought on

8    behalf of three individuals -- Mr. Bouchard, Mr. Johnson, and

9    Mr. Moore -- alongside BHU.

10           And at that time, all individuals were pro per.

11   Mr. Prince made and has made a notice -- filed a notice of

12   representation of BHU.  But the other individuals, Bouchard and

13   Johnson, were represented by different counsel.  And so

14   Mr. Moore was an individual participant in this lawsuit.  There

15   has been no notice of appearance by Mr. Prince as to Mr. Moore.

16           We have not heard from Mr. Moore, neither through

17   himself personally nor through an attorney, since this lawsuit

18   has been filed.  Instead, the only correspondence I think we

19   have received is from Yesica, ostensibly on his behalf.  But

20   it's not clear to the City that either Yesica or Mr. Moore --

21   or Mr. Prince represents him.

22           And if Mr. Prince does represent Mr. Moore, he would

23   need to file a notice of appearance on his behalf.  This is

24   underscored by the fact that the two other individuals in this

25   lawsuit were represented by separate counsel, who have

 1   thereafter dismissed their claims.

 2           So I think -- I don't want to lose -- the City does

 3   not want to simply assume that these individuals who have

 4   brought a lawsuit in their own name are represented by BHU or

 5   Mr. Prince, absent any documentation to that effect.

 6           And I'll underscore that Mr. Moore's disability was

 7   only discussed in Yesica Prado's declaration.  That's not

 8   firsthand knowledge.  There's no declaration submitted by

 9   Mr. Moore himself.

10       **THE COURT:**  Well, let me ask you.  Putting aside --

11   you're essentially stating a hearsay problem.  But there's an

12   allegation that Mr. Gregory refused to meet with Mr. Moore.

13           What's your understanding as to the current status of

14   any interactive process between Mr. Moore and the City?

15       **MS. MATTES:**  I'd have to look at my -- I'd have to

16   look at my notes.  But I'd have to look at my notes to see --

17   or not my notes.  I guess I would have to look at the last

18   correspondence Mr. Gregory received from Mr. Moore.

19           But I think what I -- what I can do, though, is,

20   taking Yesica Prado's declaration as true, I'm happy to address

21   the sort of four points that have been made, which was that he

22   requires a mobility device, that he requires assistance packing

23   and relocating, that he requires the ability to remain at the

24   encampment site or placement in an ADA noncongregate shelter.

25   Those were the four points that Ms. Prado summarized to

 1    the Court, and I'm happy to take those --

 2            **THE COURT:**  Yeah, let's just use those as an example

 3    and tell me --

 4            **MS. MATTES:**  Sure.  So as to the mobility device,

 5    the City responded that public entities under the ADA are not

 6    required to provide personal devices or medical -- I think it's

 7    called durable medical equipment.  And so we denied that

 8    request, but we did provide referrals to community resources

 9    that do provide durable medical equipment like wheelchairs.

10            As to assistance packing and relocating, we offered to

11    provide packing and lifting assistance for Mr. Moore.  And

12    again, Your Honor, keep in mind that this is four, five months,

13    and I do not believe that that was -- offer of packing or

14    lifting has been -- Mr. Moore has taken us up on that offer.

15            As to Mr. Moore's request for an indefinite stay at

16    the encampment, we said that doing so would present a

17    fundamental alteration to the City's responsibilities and

18    ongoing efforts to mitigate the identified public health and

19    safety risks at the site.

20            And then, lastly, as to the ADA-compliant

21    non-congregate shelter, our response is that access to shelter

22    is not a reasonable accommodation through the ADA, at least not

23    in the instance of Mr. Moore's stated disability.

24            But we told Mr. Moore that city programs are available

25    to any unhoused person, including shelter, pending

 1   availability.  And we referred him to our homeless response

 2   team that manages shelter availability.  And we also said that

 3   if shelter is made available and an accommodation is needed as

 4   to that shelter offer, he is welcome to put in another

 5   accommodation request related to the shelter that's offered.

 6         **THE COURT:**  So what this underscores to me -- I have

 7   to assess the likelihood of success and the relative strength

 8   of the plaintiffs' claims.  And the ADA claims, assuming we get

 9   over the standing problem, which is not insubstantial.  But the

10   prong three is prudential, not jurisdictional, so I have some

11   discretion there.

12         There are some requests for accommodations that seem

13   to me very easily constitute a reasonable request and

14   accommodations, such as enough time to be able to make

15   arrangements to gather belongings; two, assistance in packing

16   and moving, physical assistance where that is needed, and

17   things of that nature.  Maybe to the extent certain -- certain

18   property has to be stored, which meets the criteria for

19   storage.

20         The tougher one is a request to either stay or for

21   shelter, typically, non-congregate accessible shelter.  And I

22   understand there's a claim for that, but it's a much tougher

23   claim legally because you have the defense of fundamental

24   alteration of the government's -- of the agency's program and

25   responsibility, that this is something outside the scope.

1    There's a question of actual availability.  If it's

2    not available, it makes it very difficult to accommodate.  And

3    what we're hearing is that there are four hotels, but they're

4    currently full, and you can't kick people out to make room for

5    other folks.

6    And so, yes, as a matter of policy, it would be ideal

7    if the City could secure either state funds or other funds to

8    expand the list of non-congregate housing.  But to say that

9    that's required as a reasonable accommodation under the ADA, I

10    think, is a very tough sell.

11    So on the scale of likelihood of success, it seems to

12    me, on the ADA claim, you know, certain accommodations, namely,

13    time and assistance in moving, is -- seems to me a stronger

14    case than the bigger ask of staying sort of indefinitely or,

15    you know, ideal housing.

16    That leaves the state-created danger doctrine.  And

17    there it's not clear to me, at least under the state of this

18    current record, that if what this action is about is closing a

19    discrete corridor -- and there's not a general prohibition

20    throughout the city where you can't go anywhere, and with the

21    showing that the City has made, that there are public

22    bathrooms, that services, medical services, food services,

23    while not as convenient, can still reach folks either in

24    other -- I'm being told there are other encampments that are --

25    still exist or other living situations.  The City also

 1   represents that, with respect to the need for mutual aid, that

 2   there is no ban -- let me confirm this -- on campers living

 3   side by side.

 4          **MS. MATTES:**  There's no ban.

 5          **THE COURT:**  And so it may -- you know, under those

 6   circumstances, I think the case for making a claim -- a

 7   successful claim for -- under the due process clause is -- is

 8   not one that's sufficient to meet the likelihood of success.

 9          **MR. PRINCE:**  I'm sorry, Your Honor.  Could I have a

10   chance to respond to some of the --

11          **THE COURT:**  Yeah.  Yeah.  No, I did -- I wanted to let

12   you know what my view at this point.  You can be responsive,

13   because that's sort of what I'm hearing.

14          **MR. PRINCE:**  Okay.  Your Honor, to begin with -- to

15   begin with, Your Honor, again -- in kind of almost

16   chronological order or reverse chronological order, all these

17   points that the City has made.

18          First of all, the -- the question of services.

19   Counsel is saying the City's services are still offered.  I'm

20   not talking about city services.  I'm talking about six

21   different organizations that can come to that encampment now,

22   and have been coming for a considerable period of time, to keep

23   people alive, fed, and given the medical care.  That is what

24   they will be separated from.  And the -- and the difficulty, if

25   not impossibility, of those organizations being able to track

1    down and find people that have been evicted from that camp and

2    scattered is highly problematic and will immediately put them

3    at risk for a separation from those vital life-sustaining

4    support organizations.

5            So, at the outset, they're going to be harmed.

6            **THE COURT:**  And that suggests, though -- because we've

7    had exactly the same arguments made in every other encampment:

8    It's impossible to serve people.  People bring food, people

9    bring clothing, and once they're scattered, it's -- but that,

10   again, suggests:  What's the limit of that?  When -- when could

11   the City ever break up an encampment?

12           Because every time they break it up, it makes it more

13   difficult for the nonprofits to locate and serve people.  So

14   what's the limit of that argument?

15           **MR. PRINCE:**  I think -- I think the limit, Your Honor,

16   is the question of -- of -- is -- begins -- I think:  Is there

17   a limit?

18           I think the inquiry is -- is the City of Berkeley

19   doing things -- and we saw them do it on June 4th -- that -- to

20   break up the -- to take people out of this encampment.  And

21   with all of the negative impacts, that that meets the elements

22   for an affirmative act and immediately worsens the position of

23   people compared to how the government found them.

24           And I think that's the inquiry.  We had the *Alfred*

25   case, where similarly, ADA claims were there and state-created

1   danger.  Judge Coggins dismissed or found that the ADA claims

2   were not good because the City did let, at that time, the

3   pro se plaintiff request it be done.  And that's fine.  And

4   then she went on to find there was a state-created danger in

5   that case.

6          And I think that what the City is doing here,

7   Your Honor, is they're using ADA as a shield and a sword

8   against Fourteenth Amendment state-created danger.  That the --

9   the fact of the matter is that -- is that the -- a factor to

10  be -- instead of a factor to be taken into consideration in

11  will they be placed at an increased risk of harm?

12         Yes.

13         And the fact that they're -- that they're -- that they

14  have -- they're in a place where they don't -- if food is

15  brought to them as opposed to they got to go hunt for it

16  somewhere else, immediately presents itself.

17         I think that -- that the -- that's the consideration

18  that the Court should give to the question of disabilities, not

19  that -- that, well:  Here was the request and here was what

20  the City said.  And here's the limit of it.

21         But these are part of the -- part of the analysis of:

22  Are these people going to be harmed?

23         And we look at it -- well, let's look at the current

24  condition.  Right now, their disabilities are not compromising

25  their ability to get food and medical care and a pathway to

 1   housing.  In fact, their current condition is such that

 2   those -- they don't have to have -- be out there with their

 3   underlying disabilities, psychiatric or physical, being

 4   aggravated or exacerbated.

 5        The other thing, Your Honor, is that -- is that

 6   counsel is saying that they don't have a policy -- or they

 7   don't have a policy of a citywide prohibition.  Your Honor,

 8   they have a de facto policy of no camping in the City of

 9   Berkeley.  And this is why we've talked about possibly an

10   evidentiary hearing.  They have closed one encampment down

11   after the next.  People in -- at 8th and Harrison were pushed

12   out of previous locations, encampments, and sometimes just

13   individuals out on the streets.

14        And -- and so the idea that they don't have a citywide

15   camping ban on paper, they're effectively de facto at the

16   moment.  We're in court right now, as you know, where they want

17   to close yet another encampment over there in Ohlone Park.

18   This is a citywide policy and practice, if it's not on

19   official --

20        **THE COURT:**  What's the evidence?  Are you saying there

21   are no encampments at all now in Berkeley?

22        **MR. PRINCE:**  There are encampments, Your Honor, but

23   the City's determination is to close them down, is to tell

24   people to leave, to do what they did on Wednesday of last week.

25   Say:  You've got 20 minutes and go.

1     We have -- we will bring in witnesses that will say:

2  I was here, and the police came up to me and told me, "You need

3  to get out of here.  You need to move."

4          This is the reality that's out there.  It does -- they

5  can sit here and say, "Oh, they're free to go anywhere they're

6  not prohibited from being."  That's not the case.

7          The other thing, Your Honor, is that -- is that -- is

8  that the -- the City has now said that they don't have anything

9  more than four open male beds and two open female beds at this

10 moment.  That's six people, at best.

11         They're not -- what they're not saying -- and we have

12 declarations -- and I don't think the City is going to dispute

13 it -- is that offers of shelter means that you can't have your

14 RV there.  In many cases, you're limited by how much personal

15 items you can have.  And -- and, in any event, the duration for

16 the stay is limited.

17         And so these are not safer alternatives.  These are

18 not places where people can go and be as safe or safer than

19 where they are right now.  And I believe that that's the proper

20 inquiry.

21         Now, the other thing is that -- is that the City's

22 policy, written policy, housing first.  Housing first.  But,

23 okay, if it's "housing first," then it seems to me that the --

24 that what we need to look at is:  What are the steps to see to

25 it that housing is actually made first?

```
 1          And we don't see that breaking up an encampment and
 2   curtailing the ability of people in the encampment to -- for
 3   that camp to be a staging ground for housing is -- is
 4   consistent with saying "Our policy is housing first."
 5          They're not -- their policy is not housing first.  But
 6   it's -- but they -- ostensibly, that's what they represent it
 7   to be.
 8          The -- so with regard to the shelter offers, counsel's
 9   saying, "Well, they refused the shelter offers."  Why?
10          I, mean look at the individual circumstances.  People
11   whose disabilities would be aggravated at these congregant --
12   at these congregant shelters, to the point where they're
13   endangering themselves and possibly others.  So they're put in
14   a worse situation, and perhaps others are put, now, at risk.
15          The idea that -- that -- I think that we don't -- we
16   don't -- with regard to the health and safety issues,
17   Your Honor, we have a declaration here from -- oh, let me
18   just -- for Mr. Gilmore.  And it was -- it was -- it was
19   erroneously identified as the declaration of Ms. Taylor.  But
20   the signature, the electronic signature, was actually
21   Mr. Gilmore.
22          He makes it clear -- he says that -- he talks about
23   the fact that the -- that the -- that these -- the trash
24   disposal system is inadequate such that the garbage is -- that
25   dumpster is filled almost as soon as it's put there.  It was
```

1  only -- it's only picked up on an insufficiently regular basis,

2  and the configuration itself is such that it's difficult,

3  almost impossible, for some of -- for many of the residents to

4  actually place their garbage.  Berkeley residents are throwing

5  stuff in there who are not in the encampment.

6          And so, to the extent that these -- and the --

7          **THE COURT:**  But which way does that -- I read that.  I

8  wasn't sure I understood.  Which way does that cut?  If things

9  are that bad in the encampment, are you asking now for --

10         **MR. PRINCE:**  I'm sorry.

11         **THE COURT:**  Are you asking for affirmative relief to

12  now have the City maintain the trash better and come in and

13  clean -- I'm not sure -- that's, like, now getting past third

14  base.  I don't --

15         **MR. PRINCE:**  Okay.  The point I'm trying to make

16  there, Your Honor, is to the extent that the City is saying

17  that's the compelling government purpose, that's the only

18  compelling purpose they brought up, is that that -- all these

19  health and safety issues in the encampment.

20         So that's why I'm addressing this, that many of those

21  health and safety issues are because of the inadequate -- the

22  City can't have it both ways here.  They can't say that there's

23  a health and safety thing and then fail to address.

24         They did not respond with any counter-declaration to

25  what Mr. Gilmore said under oath in his -- in his declaration.

1        Not only that, Your Honor, but the -- but to the

2    extent that the camp has been there this long a period of time,

3    you would think that if he had a serious -- at the nature of an

4    exigent circumstance where the entire encampment has to be

5    cleared would have come up quite some time ago.  Now, it's been

6    there for -- Yesica Prado has been there for seven years in her

7    RV.

8        So I think that the question of health and safety,

9    which is -- we had these issues, if you recall, Your Honor, at

10   Marinship Park.  We had them, and we were able to address them.

11       It wasn't a question of a mandatory injunction from

12   you in those cases.  It was -- it was a matter of -- of trying

13   to maintain it for a time towards resolving the case by

14   creating some kind of means to get people in a safer situation,

15   which we did.

16       The other thing, Your Honor, is that -- is that

17   Yesica Prado has every right to represent the members of this

18   union in the -- and I almost don't want to even talk about the

19   ADA anymore because they're using it as a -- as a shield and

20   sword here, and it's -- it's not really -- it's a factor, but

21   it's not the determinative factor in the question of

22   state-created danger.

23       But I will address the fact that this effort by

24   the City to attack the well-settled persons seeking a

25   reasonable accommodation, workplace, housing, public -- public

 1  sector has every right to be represented.  And, in fact, that

 2  representative can -- can be the person who is having the

 3  back-and-forth with the agency or the City or the housing

 4  provider.  That is well-settled, Your Honor.  I've handled

 5  thousands of these kind of things.  The union -- that's why

 6  there is a union.  That's why there -- we have the

 7  associational standing.

 8       The idea that Mr. Gregory is walking through the

 9  camp -- we don't know how many people he's talked to -- and

10  telling, "Do you have a disability" and "Tell me about it" is

11  ridiculous, Your Honor.  I mean, the very fact -- how do you

12  think most people are going to respond to something like that?

13       Also, Your Honor, I have an e-mail right here from --

14  from Ms. Prado, who, as I say, is legally -- you can choose any

15  representative, doesn't have to be a lawyer.  It doesn't have

16  to be an officer of the organization or union or association

17  you belong to.  It could be even just -- a third party can come

18  in and serve as a representative and substitute themselves, at

19  least in the initial stages --

20       **THE COURT:**  But it goes back to our -- my original

21  observation about the problem with associational standing.

22  Every case -- and I do think the ADA is, frankly, the more

23  relevant.  You may disagree with me here.  I do think that's

24  the most relevant issue here -- that does have to -- that

25  turns -- whether a reasonable accommodation is owed turns on

1    individualized facts.

2           And a declaration from the president of the union

3    saying we have got 19 people filing claims, and they're not

4    being adjudicated, it doesn't tell me much.  I learned more

5    from the attachments to the City's declaration about at least

6    the three individuals and then finally about Mr. Moore.  But

7    until that, I had no insight into exactly what was going on,

8    what the alleged disabilities are.

9           And so it is problematic when you try to get broad

10   relief, aggregate relief, when the ADA question is really an

11   individualized kind of question.

12          Some people may need just assistance in moving.  They

13   may need time.  Other people may need -- I don't know,

14   something else -- at least claim for counseling or some more

15   stable housing situation or in a situation where there's a

16   community around them.

17          I -- it's -- you know, it -- it seems to me you've got

18   to look at each individual.  And that's the problem I have

19   here.  There's not much in the record other than evidence of

20   three individuals or four individuals.

21          MR. PRINCE:  If I could, Your Honor, it is -- we have

22   evidence in the record, substantial evidence.  And I will say

23   that perhaps some of that was filed as exhibits to Ms. Prado's

24   declaration.  We had copies of all the official requests for

25   accommodations for 21 people spelled out in detail.  It may --

1   it may not be -- we may not have attached it as an exhibit and

2   a declaration to the motion that -- that the Court instructed

3   us to file, and we had to move on it quickly, that -- but it

4   was in the prior filings, Your Honor, where there -- there is

5   evidence in -- in this -- that was before the Court and is in

6   the record of the individual circumstances of people.

7         But, again, Your Honor, I -- I really urge that --

8   that it isn't simply a question of, "Okay, we're going to close

9   the camp," and the issue becomes "What help do you need to help

10  you move?"

11        Move where?

12        And the issue is are they going to be in a worse --

13  worse situation than -- than the situation they're in now?  And

14  I think the evidence is clear.  And I think counsel has done

15  nothing to -- to kind of undermine the evidence we have here.

16        Where -- the -- if we need to bring in the directors

17  of these various organizations, we will.  And they'll tell you,

18  we will not be able -- you can't say that the same things, the

19  same support, the same food, medicine, clothing, and everything

20  else is going to be available to them.  You can't say that.

21  And that they will not be --

22        **THE COURT:**  Well, but the doctrine doesn't guarantee

23  equal -- equal conditions.  And I'm not sure what the doctrine

24  is.  But the doctrines usually involve a severe situation where

25  you've taken away peoples' tent, put them out in the cold at

1   the begin- -- two of those cases involving the beginning of

2   winter, as it turns.

3           It just -- you know, I think there are limits to this

4   doctrine.  And I probed you for what are the limits because

5   every time there's a breakup of an encampment, you can always

6   make the claim, with some merit, some factual merit, that

7   things are going to be worse.  It's harder.  You're not going

8   to get the same level of services.  But does that mean there's

9   a constitutional prohibition every time?  It's hard to imagine

10  one where that wouldn't happen.

11          **MR. PRINCE:**  Your Honor, if we -- if the City was able

12  to relocate people, like -- like we did in these cases.  You

13  even determined during the Sausalito, Your Honor, that there

14  were was issues at Dunphy Park that the City talked about.  And

15  we opposed their motion to modify the injunction.  You granted

16  it.  And you found that a better place for them to be would be

17  in Marinship as opposed to Dunphy Park.  I -- and with the

18  understanding that the -- that the parties were going to try to

19  come up with an actual solution, which we -- which we did.

20          Again, Your Honor, yes, there's -- the state-created

21  danger doctrine is the question of the vast majority of cases

22  that are brought and -- and are between -- actually between

23  businesses, where one business says, "You will place us in a

24  worse position if you allow this company to do this to us," to

25  market their product as -- begin this advertising campaign.

1          And so that's -- that's the -- the substantive due
2     process goes to a question of a constitutional right.  And the
3     constitutional right we're talking about is the right to be
4     protected from affirmative acts of government that make your
5     situation worse.
6          Now, you're asking what the limits are, Your Honor,
7     and I can't -- I don't know exactly how to answer that except
8     that 800 people -- between 2022 and 2024, 800 people in
9     Alameda County died on the streets.  That is a lot of people in
10    a very short period of time.  And the City keeps saying, "We
11    don't want people on the streets.  We've got to get the streets
12    cleared of homeless people."
13         They're putting people on the street, Your Honor, in
14    a -- in a more dangerous circumstance than where they are, at
15    least now.
16         We are not proposing that that camp stay there
17    forever, and we're not saying that they have to be placed in an
18    ideal situation, necessarily.  We think it's possible, and we
19    think it's time -- the time has come for us to look at this
20    thing in such a way as we don't have a continual -- this
21    never-ending situation where people are -- don't -- can't get
22    into traditional housing, for one reason or another.
23         They're doing what they can to survive, which includes
24    forming communities for mutual survival, as you've pointed out,
25    Your Honor, in the *Boyd* case, where you talked about the fact

 1   that that encampment was, in fact, the community benefit of

 2   having that -- having that mutual support there.  That --

 3   that's correct.

 4          And so, if you -- if you break that up and take that

 5   away, then you're making the situation of everyone in that

 6   encampment worse.  I urge the Court to --

 7          **THE COURT:**  All right.  Let me -- I understand your

 8   argument.  We are living in a post-*Grants Pass* case, so --

 9          **MR. PRINCE:**  Yeah.  But on that, if I could,

10   Your Honor, *Grants Pass* was -- was -- was said that the City of

11   Grants Pass ordinance was not -- did not constitute a violation

12   of the Eighth Amendment.

13          **THE COURT:**  I understand that.  I understand.

14          **MR. PRINCE:**  You understand all that.

15          **THE COURT:**  I understand all that.  But I have to also

16   construe doctrines within -- within, you know, existing case

17   law and taking into account what the Supreme Court has done.

18   And I -- you know, I think, there are problems with the

19   argument that you've raised because it seems to have no limit.

20          And so -- but let me ask -- I need to turn to

21   the City.

22          The Prado declaration states there are at least 19 ADA

23   requests outstanding.  I take it you have a record of those

24   requests?

25          **MS. MATTES:**  Yes, I -- I -- I'm not sure there are 19,

1   but, yes, we have a record of all requests that have been made

2   with the City.

3           THE COURT:  And those sort of remain sort of unacted

4   on because there hasn't been -- what is the status of those?

5           MS. MATTES:  We -- no, I would not say they remain

6   unacted on.  We have continued the interactive process

7   throughout these entire five-month period.

8           Like I said, granting any accommodation requests that

9   we believed were appropriate and then denying ones that we

10  believed, you know, would serve as a fundamental alteration of

11  the City's policies, such as, you know, allowing people to

12  remain in the encampment site or creating a sanctioned

13  encampment.  We don't believe that there is a need for further

14  interactive process on requests that would be a fundamental

15  alteration of --

16          THE COURT:  Have -- in other words, have these

17  requests been adjudicated, or have some not been completed?

18          MS. MATTES:  What I'd say is we have -- we have

19  responded to each of the requests that were made.  But we've

20  always held open the door for any further requests or

21  accommodations, you know.  Because it's interactive and it's

22  iterative, we have held open the door to allow for any further

23  accommodation requests.

24          And since we did not know the time at which the TRO

25  would be lifted, we continued to invite people to continue to

 1  make accommodation requests, reminding them that the City still
 2  intends to abate the encampment.  So I wouldn't say -- you
 3  know, it's hard to say that something is finalized because we
 4  keep the door open for any last-minute requests.
 5        I'll just highlight for the Court that these requests
 6  that we provided, they came in in April, when this encampment
 7  was noticed to be abated in February.  And yet, we're engaging
 8  with requests that came in April.  It's not clear --
 9        **THE COURT:**  What about the statement that Mr. Gregory
10  refused to meet in person to conduct any of these interactive
11  processes?  What's your response to that?
12        **MS. MATTES:**  I am -- I am not aware of an instance
13  where Mr. Gregory has refused to meet in person.
14        I'm only aware of -- I am -- I am aware of instances
15  where he has offered to meet with individuals.  I'm aware of
16  instances where he has given particular times. I'm not aware of
17  anybody who was taken him up on that offer.
18        I think there have been instances related to people's
19  requests to record ADA interactive process discussions, and
20  there has been a back-and-forth as to whether the request to
21  record is necessary to the ADA interactive process and whether
22  somebody could take notes.  And there has been some instances
23  where he's refused, but other instances where he has allowed
24  recording.  So I'm not aware, standing right here, that there
25  are any instances where he's refused.

1          I'll also say I don't think that there is a

2     requirement under the ADA that an in-person meeting happen if

3     there are other availabilities.  And Mr. Gregory is available

4     by phone.  He's available by e-mail.  He's -- he's pretty

5     timely in responding to all of these things.  As I've

6     mentioned, he's gone out to the encampments and made in-person

7     requests.  I would not say that the City has stymied this

8     interactive process.

9          And, if I may, I want to -- because this issue came

10    up, and I didn't have this cite, I wanted to just supplement to

11    say that, with regard to non-congregate shelter offers, there's

12    a case on point, *Reed versus City of Emeryville*.  I can give

13    you the cite, 568 F.Supp.3d 1029.

14         That case specifically is a -- says that an individual

15    can't state an ADA danger -- a state-created danger claim when

16    non-congregate shelter is offered.  It might not be a preferred

17    shelter, but it would be a shelter option.

18         **THE COURT:**  Well, all right.  Here's what we're going

19    to do.  I --

20         **MR. PRINCE:**  I'm sorry, Judge.  Could I -- first of

21    all, the -- I had it here, and I lost track of it.  But with

22    regard to Mr. Moore, that case that counsel is citing to,

23    Mr. Moore was in that case.

24         And I have the communication between Ms. Prado and

25    Mr. Gregory about -- specifically about Mr. Moore's disability

 1   and the fact that his medical provider at LifeLong Medical

 2   was -- was the person who was verifying this disability and, at

 3   that time, was unavailable to provide further documentation.

 4          My understanding now is further documentation has --

 5   has been provided by this Olivia -- I'm not sure of the last

 6   name -- but the person from LifeLong.

 7          Your Honor, I think that we have -- we have a --

 8   counsel is saying that Mr. Gregory didn't do this, did this.

 9   These are questions that we need to develop a record on.  We

10   obviously have --

11          **THE COURT:**  Well, I'm going to obviate that.  I'm

12   going to obviate that.  Here's my ruling:

13          I find that the plaintiffs have made a sufficient

14   showing of a claim on the ADA claim, at least a likelihood of

15   success with respect to the right to complete the interactive

16   process for those who have filed and asked for reasonable

17   accommodation.

18          Seems to me that it is not clear that that interactive

19   process has been completed, and there's an entitlement to an

20   interactive process.

21          I will say, in the interactive process, when you get

22   into it that the claim for, you know, either time to get stuff

23   together, assistance in moving is a much stronger ADA

24   reasonable accommodation claim.  I think any claim to stay

25   indefinitely or claim or entitlement to some form of housing,

1   including non-aggregate, accessible housing, while ideal, is

2   a -- is a very difficult claim, in my view, under the ADA.

3          With that guidance, though, I do think that the

4   process needs to go forward, and at least the process of

5   interactive discussions is something to which those who have

6   filed a request for accommodation are entitled to.

7          And so I'm going to exempt from them, at least for

8   some pendency, so that process can play out, and hopefully that

9   can play out within the next, you know, 30 days, 60 days,

10  something like that.  But this -- that part of the ruling

11  applies to those who have already filed claims for

12  accommodation, that the process shall proceed.

13         For those who have not filed such a claim, I don't

14  find that the -- the BHU has established the requisite showing

15  of likelihood of success.

16         I understand the state-created danger documents, but I

17  think the requisite degree of danger has not -- although

18  there's some decrement and some disadvantage, obviously.  But

19  to say that on a class-wide basis, on a blanket basis, that

20  that's been shown in view of the record that has been made,

21  including the City's filings, that that requisite showing of

22  likelihood of success is not warranted, so -- however, I think,

23  people need to be given, as a matter of due process, fair

24  warning.

25         So if you're -- if they don't fall into the ADA having

1   already filed a request for accommodation, they will be subject

2   to -- no longer be subject to protection of this Court, except

3   that I'm going to require, out of fairness, at this point,

4   given everything that's happened, that the City give one-week

5   notice before moving on their property or belongings or their

6   residence.

7          But apart from the notice requirement, the

8   injunction -- the limited injunction that I'm issuing now will

9   not apply to them.  But it will apply to those who have, under

10  the ADA, filed a claim, a written claim.  It appears that, from

11  the plaintiffs' filings, that there are perhaps 19 people in

12  that category -- I don't know; I may be off by a few -- and how

13  many are still at play in the camp, I don't know.  Maybe it's

14  only a dozen left at this point.

15         But what I'm going to order is that the parties then

16  report back to me what's the conclusion of that interactive

17  process, and I will then decide whether to lift the injunction

18  of that process, if I decide that the interactive process has

19  been executed.

20         **MS. MATTES:**  Your Honor, we understand your Court's

21  order.  Can we ask for clarification on the ADA process?

22         Is the Court willing to set a timeline?

23         I would just say we've been at it for five months, and

24  it feels like it may be sort of never-ending.  We will say no,

25  and further, the same requests will be repeated over and over

 1    again; or there will be delays of weeks or months at a time.

 2        You know, I'll just give you an example of the ones we

 3    provided for the Court.  We responded on May 2nd and have not

 4    received a response.

 5        So does this -- you know, insofar as this counts as a

 6    pending ADA request, you know, we would appreciate if there was

 7    a timeline set because, you know, it's been now two months --

 8        **THE COURT:**  I'm going to set a 60-day completion date,

 9    and I expect the parties to meet and confer and work in terms

10    of a timeline and exchange of documents.

11        Now, if it gets to the point where one party says "I'm

12    not going to do X, and I'm going to stand on this," or the

13    other side, "I'm not going to do Y.  I'm going to stand on

14    that," I will take that into account in determining whether or

15    not there's been a completion -- a good faith completion of the

16    interactive process.

17        I will say that with -- for instance, one of the

18    sticking points has been recording.  I'm not sure I understand

19    what the objection to the City -- on the part of the City of

20    recording.  So I don't look favorably on saying, "I'm going not

21    meet with you if you're going to bring a tape recorder."  I

22    just don't -- I don't see that.

23        And, you know, the requests -- and I think the parties

24    have to take seriously that there is a distinction.  I mean,

25    there are certain disabilities that are more obvious than

```
 1   others.  And so that should be taken into account.  And some of
 2   the letters that the City has taken assumed that there was a
 3   disability.  But it's also reasonable that you don't have to
 4   just demonstrate a qualifying disability, but you have to show
 5   a nexus as to why -- to the accommodation.
 6        So if the requested accommodation is, "I want to stay
 7   indefinitely in the corridor for various reasons," or, "I need
 8   housing, accessible housing and any other accommodation won't
 9   work," there needs to be some explanation.
10        Now, whether that has to be a letter from a doctor, I
11   don't know; whatever is reasonable in that regard.  It's
12   something that -- you know, I want the parties to meet and
13   confer.  But I -- there does have to be some explanation of
14   what the disability is, if it's not obvious, and how it relates
15   to the request -- requested accommodation.
16        I will also offer up that Judge Illman is available to
17   help mediate if you have -- and I asked him; he'd be willing to
18   mediate individual claims and disputes regarding
19   accommodations.  And he said he would make himself available on
20   an emergent basis.
21        So I'm going to enter an order saying that, you know,
22   if there are disputes, and if you want to talk global, you
23   know, discussions that, you know, for all these folks,
24   whatever, he's available to meet.  But, mainly, I told him,
25   because there may be disputes over the reasonable accommodation
```

 1    interactive process, he's available to mediate that to a

 2    reasonable degree.  I don't know.  You know, hopefully won't --

 3              **MR. PRINCE:**  Your Honor, may I -- may I ask, with

 4    regard to the -- I understand that -- the Court's order, and

 5    what I would ask is -- is that the -- that if we are able to

 6    document, which, I think, unfortunately, we will -- and I

 7    understand a substantial number of persons continue to be

 8    protected, at least as long as this interactive process is

 9    underway.

10              But to the extent that people are harmed, the City has

11    made a lot of representations in terms of "People will be okay

12    outside the camp."  If we begin to get the evidence that people

13    have been harmed, that they are in a worse position, that we

14    would be able to come back to the Court --

15              **THE COURT:**  Well, there, you're going to have to move

16    through the vehicle of reconsideration, because I -- the record

17    is the record.  Everybody's had their chance.  I did have to

18    expedite.  And so I'm ruling on the basis of the record that's

19    before me, and that is my ruling.

20              Now, if you come up with some -- as in any ruling,

21    some new evidence that you think is material and wasn't

22    obtainable before, et cetera, et cetera, and meets the standard

23    for reconsideration under local rules, you can seek request for

24    reconsideration; but until then, that's my ruling.

25              **MR. PRINCE:**  Also, Your Honor, if I could, as you

1   know, Judge Illman was instrumental in -- in helping us with

2   these other cases, which -- which resulted in -- in a real -- a

3   positive settlement, as you're very familiar with it.

4          To the extent that we did file an administrative

5   motion for -- to see if the Court would say whether the

6   party -- order settlement discussions.  You can't order the

7   parties to settle, but the Court does have the authority to

8   order the parties to sit down and see if a settlement could be

9   worked out.

10          Because we're going to have this continually.  And I

11   would -- I would -- so my question is whether Judge Illman

12   might be available for that purpose.

13          THE COURT:  He may be available, but that, I'm not

14   going to do unless the parties stipulate to that because --

15          MR. PRINCE:  I'm sorry?

16          THE COURT:  I won't do it unless the parties both

17   agree.  I think he would be available, and I would prevail on

18   him, but if the parties want to do that, I'd certainly welcome

19   that, and I would recruit him.  But he has already accepted the

20   limited assignment I've done.

21          And I need to go because I've got a 12:00 o'clock

22   thing I've got to talk to.  So --

23          MR. PRINCE:  Thank you, Your Honor.

24          MS. MATTES:  Sorry. Just -- if we have any more

25   questions about the contours of Your -- Your Honor's order,

1    what's the easiest way?  I have some -- some questions, but I

2    don't want to keep the Court any longer.

3            **THE COURT:**  Well, if you have joint questions, why

4    don't you send me a joint -- you know, I'd like you to meet and

5    confer, if there's any ambiguities, to see if you can work it

6    out.  If not, submit to me a request for clarification.

7            **MS. MATTES:**  Okay.

8            **THE COURT:**  Okay.

9            **MS. MATTES:**  Thank you, Your Honor.

10           **THE CLERK:**  This hearing is concluded.

11               (Proceedings adjourned at 12:01 p.m.)

12                        ---o0o---

13               <u>**CERTIFICATE OF REPORTER**</u>

14           I certify that the foregoing is a correct transcript

15    from the record of proceedings in the above-entitled matter.

16

17    DATE:    Saturday, June 14, 2025

18

19

20

21

22    _____
      Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
               Official Reporter, U.S. District Court

23

24

25

# OFFICE OF THE CLERK
# UNITED STATES DISTRICT COURT
## Northern District of California

### CIVIL MINUTES

**Date:** June 10, 2025      **Time:** 10:33-12:01      **Judge:** EDWARD M. CHEN
1 Hour, 28 Minutes

**Case No.**: 25-cv-01414-EMC      **Case Name:** Berkeley Homeless Union v. City of Berkeley

**Attorney for Plaintiffs:** Anthony Prince
**Attorneys for Defendants:** Marc Shapp, Laura Mattes

**Deputy Clerk:** Vicky Ayala      **Court Reporter:** Ruth Ekhaus

### PROCEEDINGS

Motion for Preliminary Injunction - held (In-Person)


### SUMMARY

Parties stated their appearances.

The Court granted in part and denied in part Plaintiff Berkeley Homeless Union's motion for a preliminary injunction. The Court found the following:

**Irreparable Harm:** Berkeley Homeless Union ("BHU") established a likelihood of irreparable injury from imminent displacement for its members residing in the encampment at 8th and Harrison Streets in Berkeley, California ("Harrison Corridor").

**Public Interest and Balance of Equities:** The balance of hardships and public interest do not tip decidedly in favor of the BHU. The continuing public health hazard, emergencies at the Harrison Corridor, and financial and administrative burden on the City tip both factors in the City's favor. As an encampment continues over time and if health and safety hazards persist, the government's interest in closure increases. And where advance notice of an intent to eventually close an encampment is given, the reliance interests of residents tends to diminish. In this case, the City has provided reasonable responses to the four specific potential harms faced by residents if the encampment is closed (including e.g. access the public restrooms, food and medical services provided by public agencies.) Although BHU has demonstrated irreparable harm and potentially worsening conditions if resident lose the encampment, the hardship does not tip decidedly in BHU's favor, and thus BHU must demonstrate a likelihood of success on the merits, not merely the raising of serious questions on the merits.

**Likelihood of Success:** As an initial matter, regarding associational standing, BHU easily satisfies the first two prongs of the *Hunt* associational standing test. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344–45 (1977). Because BHU's Americans with Disabilities Act ("ADA") claim requires substantial individualized evidence, BHU does not clearly satisfy the third prong of the *Hunt* test. However, because the third prong is prudential, the Court allows BHU to bring its claims on behalf of its members.

- **ADA Claim:** BHU is likely to succeed on its ADA claim that the City has not completed the interactive process to identify a reasonable accommodation for its members living in the Harrison Corridor for whom BHU has submitted accommodation requests. On the potential merits of the reasonable accommodation claims, BHU's argument that the City has failed to provide a reasonable accommodation by refusing to allow BHU members to continue residing in the Harrison Corridor indefinitely or by failing to obtain interim or permanent housing for these individuals is less certain because such accommodations could well constitute a fundamental alteration of the City's program to abate and close the encampment or place a burden on the City which cannot be met (there currently is limited housing availability). *See Tennessee v. Lane*, 541 U.S. 509, 532 (2004). At this juncture, the City reports that only limited congregate housing is available. No non-congregate housing is currently available. On the other hand, claims of entitlement to sufficient time to get things in order before the move and physical assistance in moving are likely reasonable requests.

- **Fourteenth Amendment Claim**: BHU is unlikely to succeed on its Fourteenth Amendment claim because it fails to demonstrate that the City's action will place its members residing in the Harrison Corridor in a state-created danger related to a loss of 1) "bathrooms," 2) "access to food and water" such as from the "Dorothy Day House," 3) "mutual protection" from "community watch groups and buddy systems," and 4) "medical and case management services" from "Lifelong Medical and Bay Area Community Services." Prado Decl. 1 ¶ 7 (Dkt. 72-2). First, regarding access to restrooms, the City states that it maintains "multiple public restrooms throughout Berkeley," including one "located a few blocks from the Harrison Corridor" in "the Tom Bates Regional Sports Complex" that is "accessible at all hours." Vance-Dozier Decl. ¶ 5 (Dkt. 82-2). Second, regarding access to food and water, the City states that its Homeless Response Team ("HRT") coordinates the provision of services with providers including the Dorothy Day House for those throughout the City. Vance-Dozier Decl. ISO City's Opp'n to Plaintiffs Bouchard and Johnson's Mot. for PI ¶ 13 (Dkt. 56-2). The City further states that the Dorothy Day House is located "2.5 miles" from the Harrison Corridor and it is unaware of "any Harrison Corridor residents who walk from the encampment to Dorothy Day [H]ouse for services, and certainly not individuals who have mobility limitations." Vance-Dozier Decl. ¶ 4. BHU does not establish that its members would lose access to these services because of the City's abatement and closure of the Harrison Corridor. Third, regarding mutual protection, because the "City has no prohibition from unhoused individuals living alongside others" and seeks "to abate and close this particular encampment" due to the "severe public health and safety threats," BHU does not establish that its members will necessarily loss access to mutual protection from the City closing this encampment. Opp'n at 24 (Dkt. 82). Fourth, regarding continual access to medical and case management services from Lifelong Medical and

Bay Area Community Services, BHU does not demonstrate that its members would lose access to these services from the City's abatement and closure of the Harrison Corridor.

**Limited Injunctive Relief:** Accordingly, within 60 days, the parties shall complete the interactive process for those BHU members currently residing in the Harrison Corridor.   To facilitate the interactive process, the City may request and BHU shall provide reasonable documentation demonstrating a nexus between the individual's disability and the associated need for the requested accommodation.  Further, the City shall allow recordings of the interactive process when requested. These individuals may not be evicted until the interactive process is fairly completed, absent further order.  This injunctive relief is limited to those BHU members currently residing in the Harrison Corridor for whom BHU has already submitted a written accommodation request.  Within 60 days, the parties shall file a joint status report.  On an emerging basis, Judge Robert Illman is available to mediate individual claims for accommodations.

Any other Harrison Corridor encampment resident is not afforded such protection.  However, the City must give at least one week's notice before moving on their property.

Should BHU seek reconsideration of this Court's ruling, BHU must file a motion for reconsideration pursuant to the Local Rules.  *See* Civil Local Rule 7-9.